## OCTOBER TERM, 1869.

### Samuel B. Thomas, Sheriff, v. Wm. B. Taylor.

1. LAWS OF NATIONS: GOVERNMENT OF THE STATE OF MISSISSIPPI UNDER CONFEDERATE STATES AND THAT UNDER UNITED STATES NOT IDENTICAL: ACTS AND OBLIGATIONS OF FORMER NOT BINDING ON SUCCEEDING GOVERNMENT. — The government of the State of Mississippi as one of the United States, and the government of the State of Mississippi as one of the Confederate States, were not identical, and the acts and obligations of the latter government are not, *ipso facto*, binding upon any government subsequently erected in the State of Mississippi under the authority of the United States.

2. CONSTITUTIONAL LAW: OATH TO SUPPORT CONSTITUTION OF UNITED STATES. *Hill* v. *Boyland*, 40 MISSISSIPPI 640. — The provision in the Constitution of

the United States, which requires senators and representatives in Congress, members of the several State legislatures, and all executive and judicial officers, to take an oath to support the Constitution of the United States, is not merely directory, but compliance therewith is absolutely necessary and to this extent *Hill* v. *Boyland*, 40 Miss. 640, overruled.

3. LAW OF NATIONS: GOVERNMENTS DE FACTO: STATE OF MISSISSIPPI AND CONFEDERATE STATES NOT GOVERNMENTS DE FACTO, AS DEFINED IN INTERNATIONAL LAW.— A government *de facto*, as defined in international law, is a government completely, though only temporarily, established in the place of the government *de jure*, occupying its capital and exercising its power, and which is ultimately overthrown, and the authority of the Government *de jure* re-established; as thus defined, neither the government of the State of Mississippi, nor of the Confederate States, as they existed during the late rebellion, were *de facto*.

4. SAME: SAME: TO WHAT EXTENT GOVERNMENTS OF THE STATE OF MISSISSIPPI AND OF CONFEDERATE STATES DE FACTO: WHAT ACTS OF, BINDING. — A government *de facto*, as generally understood, and not in its technical sense, is any organized government established for the time over a considerable territory in exclusion of the regular government; the acts and obligations of such a government in hostility to the government *de jure* are unlawful, and of no binding force; transactions between individuals, if legal and binding under ordinary circumstances, cannot be pronounced of no obligation, because done in conformity to the laws of such *de facto* government.

5. CONSTITUTIONAL LAW: SECESSION OF MISSISSIPPI DESTROYED OLD GOVERNMENT IN THE STATE: NO GOVERNMENT IN THE STATE AFTER CLOSE OF THE WAR. — The government which was organized in the State of Mississippi after the passage of the ordinance of secession, abolished the old government of the State, and upon the overthrow of the insurrectionary government there existed no government in the State until one was brought into existence by the powers authorized under the Constitution of the United States to create a new State government.

6. LAWS OF NATIONS: LAWS OF CEDED OR CONQUERED COUNTRIES IN FORCE UNTIL ALTERED BY NEW SOVEREIGN, NOT APPLICABLE TO REBELLION NOR TO STATE OF MISSISSIPPI AFTER CLOSE OF THE WAR.— The general *principle* of the law of nations, that the laws of a ceded or conquered territory existing at the time of cession or conquest continue in force *until* altered or abrogated by the new sovereign, is not applicable to the case of a rebellion, and not applicable to the relations between the government of the State of the Mississippi under the Confederate States and the United States after the overthrow of the former government; because the United States after the surrender did not hold the State of Mississippi either as ceded or conquered, but regained the title and possession of which it was temporarily deprived.

7. SAME: LAWS OF THE STATE OF MISSISSIPPI ENACTED DURING THE WAR NOT BINDING, UNLESS READOPTED BY THE SUCCEEDING GOVERNMENT. — The laws and obligations of the government enacted and incurred during the war ceased upon the destruction of the government that enacted and

incurred them, and were of no binding force upon the government which succeeded, until readopted by such government.

8. SAME: CASE IN JUDGMENT. — The State of Mississippi during the war issued "treasury notes" and "cotton money," and enacted that they should be receivable in payment of taxes. After the organization of the "Provisional Government" of the State of Mississippi under the proclamation of President Johnson, the "treasury notes" and "cotton money" were tendered in payment of taxes due the "Provisional Government." *Held*, that the "Provisional Government" was not bound by the obligations of the government that existed in the State during the war, and could not be compelled to receive the "treasury notes" and "cotton money."

9. CONSTITUTIONAL LAW: EXISTENCE AND STATUS OF STATE GOVERNMENT A POLITICAL QUESTION: ACTION OF POLITICAL POWERS CONCLUSIVE UPON COURTS. — Sovereignty in every State resides with the people, and they may alter and change their government at pleasure. The fact of such alteration or change is a political question and to be decided alone by the political power of the government, and its action is conclusive upon the courts.

10. SAME: VALIDITY OF CONVENTION OF 1865, AND OF THE PROVISIONAL GOVERNMENT. — The Convention of 1865, having been called by authority of the President of the United States, and the government organized under it having been subsequently recognized by Congress as provisional, the action of the President and of Congress as to the validity and character of such government is conclusive, and binding upon the courts of the States and of the United States.

11. "TREASURY NOTES:" "COTTON MONEY:" ISSUED IN AID OF THE REBELLION: ILLEGAL AND VOID. — "Treasury notes" and "cotton money" having been issued, at a time of great pecuniary want, to supply a circulating medium for ordinary business transactions, and also to furnish the means by which an empty treasury of the State might be replenished, were, in operation and in effect, in aid of the rebellion, and therefore, by virtue of the ordinance of the Convention of 1865, illegal and void.

ERROR to the Chancery Court of Hinds county. Hon. John Watts, chancellor.

William B. Taylor, defendant in error, on the 31st of May, 1866, filed his bill in the Chancery Court of Hinds county, stating that he was the owner of fifty bales of cotton, raised in the county of Hinds, and that he was about to ship the same to market; that there was due and owing to the State of Mississippi the sum of two dollars per bale, tax on said cotton, by virtue of an act of the legislature of the State of Mississippi, entitled "An Act laying a special tax upon certain persons and

654 HIGH COURT OF ERRORS AND APPEALS.

Samuel B. Thomas, Sheriff, v. Wm. B. Taylor.

property therein named," approved the 16th of November, A.D. 1865; that on the 29th of May, A.D. 1866, he tendered to the deputy of plaintiff in error, who was sheriff of the county of Hinds, in payment of said tax, a treasury note of the State of Mississippi, commonly called a cotton note, of which the following is a copy:

"No. 4663.    On demand, after proclamation to present, the State of Mississippi will pay to bearer the sum of one hundred dollars, out of proceeds of cotton pledged for the redemption of this note, at the Treasurer's office in Jackson, Mississippi.

"Receivable in payment of all dues to the State and counties, except the military tax.

"Issued 1st day of May, 1862.    T. D. Pace, for Aud.    H. Hobbs for Treasurer."

That said treasury note was issued by virtue of an act of the legislature of the State of Mississippi, entitled "An Act authorizing the issuance of treasury notes, as advances upon cotton," approved December 19th, 1861; that by said act said treasury note was receivable in payment for all taxes "now due, or that may hereafter become due, to the State, or to any county or municipal corporation," except the military tax; that the said deputy sheriff refused to receive said treasury note, on the ground that he was not authorized by law, and that the Act of November 16th, 1865, levying the special tax on cotton, required the collector of taxes to collect the same "in the currency of the United States;" that said deputy sheriff is proceeding to sell said cotton, in payment of the tax.    The bill prays for an injunction, that the said sheriff receive the treasury note in payment of the tax, and for general relief.

Plaintiff in error demurred for the want of equity on the face of the bill.    The demurrer was overruled, and plaintiff in error declining to answer, the bill was taken for confessed, and final decree entered according to the prayer of the bill.    From this decree a writ of error is prosecuted, and the error assigned is the action of the court below in overruling the demurrer to the bill.

*Wiley P. Harris, C. C. Shackelford,* and *Jasper Myers,* Acting Attorney-General, for plaintiff in error.

In determining how far the State of Mississippi and the rightful authority which now controls her people are bound by the acts and engagements of the government which was organized under the ordinance of secession in 1861, and finally overthrown by the military forces of the United States in 1865, we should first ascertain the precise character of that government while it existed.

At the date of the ordinance of secession, the State of Mississippi was one of the States of the American Union, and her constitution and government constituted part of the machinery by which the government of the United States was carried on and maintained. The government which then existed assisted to form the Senate and House of Representatives of the United States, and in the election of the President of the United States. The laws of the United States were the supreme laws of the State of Mississippi; and though the government was separate from the governments of the other States, it was not separate from that of the United States, because there was an intimate connection between them, and dependence of one upon the other.

The government founded on the ordinance of secession was a government without any connection with, or dependence on, the government of the United States. The central idea in its formation was the denial of such connection — the denial of the authority of the Constitution and laws of the United States over the people of Mississippi, who were declared to be no longer part of the people of the United States. This denial was accompanied by the adoption of a new constitution, like the other in many respects,—in all respects, indeed, so far as it affected the local institutions of the State,—but fundamentally different in that feature which severed the connection of the government of Mississippi with that of the United States, and in the assertion of the absolute independence of the government of the former. The adoption of this constitution was followed by the abolition of all laws by which the people of

Mississippi and the government thereof participated in the government of the United States. The representatives in the Congress of the United States were withdrawn.

The government thus set on foot proceeded, in conjunction with other State governments similarly erected and controlled, to form a confederation of States, by adopting a constitution and government for the people of the States so confederating, through the agency of these State governments. The obligations and connections thus formed and incurred were wholly incompatible with those which existed under the government of the United States, of which the new confederation declared themselves entirely independent, constituting a new nation.

The statement of the character and attitude of the government of the State of Mississippi, one of the United States, and the government of the State of Mississippi, one of the Confederates States, is enough, without argument or comment, to enable us to affirm that the two governments were not identical — were not the same, and could not in the nature of things be the same. What followed or flowed from the new combination — what the government of the State of Mississippi, a member of the Confederate States, did during the four succeeding years, cannot, without doing violence to common reason, be said to have been done by the government of the State of Mississippi, one of the United States.

The State was the same, and the people the same; but they were under a different government — not the legitimate successor of the old one, but an usurping government, which almost immediately after its erection became an insurrectionary government. The sovereignty of the United States over the territory and people not having been relinquished, remained, but was rendered for a time inoperative, by the resistance which the insurrectionary government successfully opposed to its practical assertion. I state the case as all men not blind to the actual condition of things must speak of it.

It would be folly now to resort to political theories to determine whether the State government from 1861 to 1865 was the legal and, legitimate government of the State of Mississippi,

having legal relations to the Constitution and government of the United States. We must look to the laws and public declarations of the rightful and supreme authority for the character of that government, and the validity of its acts. By these laws and declarations, beginning in August, 1861, and coming down to 1865, the government of the United States has, with unvarying tone, characterized them, not as governments, but, as unlawful combinations of rebellious persons, of insurgents, usurping the functions of government, and forcibly controlling the people. That government has regarded them as parts of a machinery for waging unlawful war and making treasonable resistance to the rightful authority of the United States, having its central power in the government of the Confederate States. In the estimation of that government, this machinery is blended into one combination to overthrow, by force of arms, the Constitution of the United States. This view was taken of them at the beginning, it was maintained throughout the struggle, and is maintained at this hour. To this complexion have we come at last, and there is no room for argument or disputation. No logic can avert or evade the palpable fact.

The origin, purpose, and conduct of these State governments support the position taken by the United States. They were founded on a purpose to cast off and repel the Constitution and laws of the United States. Their history is a history of war, and preparation of the means to make war, against the authority of the United States. They did practically, for a time, subvert the Constitution of the United States within their territorial limits, and did repel; and for a time maintain, an effectual resistance to that Constitution.

That these governments were illegal and without authority, except that derived from force while they existed, is a proposition too self-evident to admit of debate. There has been no recognition by the government of the United States. The rights of belligerents have been conceded to them, and the fact that they controlled certain districts of country has been admitted, but for no other purpose than to mitigate the evils of

42

war, and to enable the United States to invest the people of those districts with the character of public enemies, and their property as enemies' property, in order that the advantages of capture and seizure might be rightfully secured according to the laws of war; but while the recognition proceeded to this limited extent, the government of the United States constantly asserted the rights of *sovereignty* over *the territory and people*, and treated the people as enemies, and also as *rebellious citizens* of the United States, as by the public law of nations it might rightfully do, and denied sovereignty to the insurrectionary power. See Prize Causes, 2 Black's Rep. S. C., U. S.; 1 Kent, 9th ed. p. 63, note 1.

It is idle to contend that because the government of the United States continued to characterize the people as people of the United States, and the States as States, by their names, that there was an implied recognition of the legality of the combinations which for a time controlled them. The *position* of the Federal Government has been that they were still States of the American Union, with their legitimate governments displaced by insurgents. This condition of things is the very contingency which was contemplated by the framers of the Constitution, when they provided for aid by the national government to suppress insurrection in a State, and the guarantee of a republican form of government. These provisions look to the contingency of an insurrection or revolution which might displace for a time the legitimate government; a condition of things compatible with the idea that the State, in such circumstances, may be still a State of the Federal Union, and the people thereof people of the United States.

The character of the combination which usurped the functions of the legitimate government for an illegal and unconstitutional design, whether it is to be regarded as a *de facto* government or not, is, in our view, of little importance in this inquiry, since the supreme government has denounced it as without any legal authority or sovereign power to control the State and people. To admit that for a time they had acquired

by force the power to govern, and did by force govern, the people, does not affect the question under consideration.

· The argument for the appellee proceeds upon a proposition which has no foundation. The proposition is, that if the government which prevailed during war was a *de facto* government for any purpose, then its acts are legal and binding on the State, except in so far as they were in direct conflict with the Constitution of the United States; that all the legislation of that government continues in force until repealed. On the other hand, if not a *de facto* government, with legal capacity to bind the State, then nothing which took place while it existed (not even private contracts and marriages) is valid. We may admit the *de facto* government without legal authority to do any sovereign act, and yet the consequences ascribed to it do not by any means follow. When a *de facto* government is displaced by the rightful government, when the usurping government is overthrown by the legitimate government, it matters not how flagrant the usurpation, or complete its overthrow, the private contracts of parties during its continuance, marriages according to existing law, and all those acts which pertain to the economy of private life, done and performed, the adjudication of courts, the execution of judgments and decrees, are valid and effectual. The laws of such government, while its *power existed*, are treated as laws; and although they cease with the overthrow of the usurped authority by which they were enacted, yet their extinction by this means, as respects the acts and transactions referred to, has no greater effect upon the past than the repeal of a statute, which never invalidates acts done under it while it was in force.

Acts done in obedience to the laws of the *de facto* government, though in their nature treasonable, are not treated as treason; for though the laws of the usurping government were not laws to the rightful government, yet they were laws to the people who could not resist them. The rightful government, not having the power to protect the people under the sway of the usurping government, abstains from punishing those who yielded obedience to its laws. These principles are ap-

plied to such a condition of things for the sake of humanity, and for the protection of the people. These are the consequences which flow from the fact that a temporary State government, though possessing no legal authority, existed, with power to enforce its laws over the people, when that government is overthrown by the rightful government or authority. The laws of the insurrectionary government ceased when that government was overthrown. They had no legal authority, and had only the authority which force gave them, and when the sustaining force yielded, the laws passed away, so far as they affected the future. They could not, in the nature of things, continue operative without the consent of the incoming legitimate authority. It rests with the legitimate government to ratify them or not. Their continuance does not depend on the authority of the government overthrown, but on the authority of the incoming legitimate government.

The doctrine that the laws of a usurping State government, and its engagements, bind the rightful government; that, until repealed, the laws have equal authority with those of the legal government; and that in the present case all the laws and acts of the usurping government not contrary to the Constitution of the United States are valid, — leaves no mark of distinction between a government possessing no rightful authority, and one which does; for all the acts of a rightful government contrary to the Constitution of the United States are void, and those which are not in conflict with the Constitution continue in force until repealed: so that on this doctrine there is no such thing as an illegal State government. They are all legal, it matters not how flagrant the usurpation.

The notion that the article of the Code on the subject of *de facto* officers (which is merely declaratory of the common law) cures the rebellion, is about the greatest mistake of which I have any recollection. That this article should be applied to the exercise of *political* power or the usurpation of *political* power, is perfectly astounding.

As to the government they served, the officers of the *de facto* government were officers *de jure*. Political usurpation by a

combination under the form of government, is above the reach of the Revised Code of Mississippi.

It will be found upon examination that the truth lies between the extreme opinions held on both sides of the question. There was a government here which, for all purposes of conservative protection of private rights and contracts, and of individuals obeying its laws, from forfeiture or punishment, was a government *de facto*, but which government did not possess the *sovereignty over the territory and people*. This is what has been denied by the United States with persistent purpose. Those who contend that the insurrectionary government was a *de facto* government, as known to the laws of nations, found their arguments upon political conditions altogether different from those which resulted from the attempted secession of the Southern States. They cite cases of independent nations, where the people overthrow their government or change their rulers, erected another, which achieved for a time success, and acquired the sovereignty of the country, and foreign nations recognizing a government representing the sovereignty over the people and Territory, treat with it as a power capable of binding the State, and hold the nation, and all succeeding governments responsible for its engagements, and for injuries inflicted by it or the case of a revolted province affording evidence of capacity to maintain its independence acquiring the sovereignty of the people and country. Foreign nations recognizing the powers that be as possessing the sovereignty of the country, may insist that the engagements entered into by the power which represented and exercised for the time, the complete sovereignty of the country, shall be respected. Halleck, Int. Law, pp. 75–77. Or the case of the complete conquest of a country, as in the instance of Hesse-Cassel, conquered by Napoleon, and annexed to Westphalia by the treaty of Schönbrunn. The conquest was complete, the Duke expelled, and the conquest confirmed by treaty. On the overthrow of Napoleon by the allied powers, the Duke was restored; but publicists held that persons who had paid debts due to the Duke by order of Napoleon, or who had been released by him, were discharged from the debts,

because Napoleon had by conquest acquired the country, and was the sovereign, and so recognized; besides, his dealing with the debts was compulsory.   Halleck, 840.

In arraying these cases, however, it is obvious that those who uphold this view assume the very point at issue.   They do not indeed say that the States acquired sovereignty, but they say the States possessed the sovereignty at the beginning.   They go back to the acknowledgment of the independence of the colonies as independent states—the federal *compact* of union, otherwise called the Constitution of the United States, and the withdrawal from this compact.   The State government *recognized by* the people of the State being the sovereign of the territory and people, can in no wise be affected by the mere severance of the political tie which connected the States with other States, in a compact of union.

In the judgment of nations, we did not acquire the sovereignty over the territory, separately or combined.   If we had done so, we would have been recognized.   The paramount government of the United States denied and still denies that we had the sovereignty to begin with, and scouted the idea that we had achieved it, or could achieve it.   This is the political judgment of the national government, that no State government separately, nor the Confederate government, acquired the sovereignty of the country.   To this extent, therefore, the doctrines applicable to *de facto* governments generally are necessarily modified by the peculiar position of the State as a member of the Federal Union; the Government of the United States, claiming to be the paramount sovereign, the States being subordinate, denying that the States ever possessed complete sovereignty, or the capacity or power to become sovereign.   To this denial the Government of the United States attached great importance.   The correspondence of Mr. Seward with the Ministers of the United States abroad is full of this idea; and the acts of Congress, and the proclamations of Mr. Lincoln, are characterized by the same studied refusal to invest the insurrectionary governments with the full attributes of *de facto* governments, possessing for a time the sovereignty of the country.

Therefore, we are to treat these governments as *de facto* governments in a *qualified sense*, as combinations exercising sway temporarily, but not representing the sovereignty of the country, without which no government can bind a state.

The court will be at no loss to understand the policy of the United States Government. In substance, that government announced to foreign nations that no government erected in a State of the Union, or government erected by a combination of States, and not *recognizing the Constitution of the United States*, would be recognized by the United States as possessing the sovereignty of the country to the extent which would enable such government to contract engagements by treaty, or to bind the people; and hence it was intimated in plain terms, that a recognition of such government would be a *casus belli*. Of course they admitted the *possibility* of such governments succeeding, but always denied that there was the least probability of their acquiring sovereignty.

The case of *Hill et al* v. *Boyland*, 40 Miss., proceeds upon the idea that the State had sovereignty at the beginning, and never lost it; that during the war we were no part of the people of the United States (p. 632); and actually assimilates the present condition of the State to that of a ceded or conquered country (p. 639). The United States has never afforded the slightest pretext for the assumption that they have acquired the State by cession or conquest. The position of that government is, that resistance to its authority in these States has been put down, and the combinations making that resistance overthrown.

At the time the case of *Hill* v. *Boyland* was decided, the Convention of 1865 was supposed to be the authoritative source of an established government, and that the position of the rightful authority towards the past was fixed and ascertained. Since that time the Congress of the United States has denied the authority of the Convention of 1865 to establish government here.

The opinion in that case declares the governments of the war governments *de jure*, and speaks of President Johnson's declaration, that there was no civil government here after the surren-

der, as a foolish dogma. The Supreme Court of the United States, however, has said, in 6 Wallace, 13, that these governments and all their proceedings were null and void, However pleasing the idea to a certain class of political theorists, that secession was but a temporary separation of one sovereign State from other sovereign states, involving no change of internal government, and that this internal government was the sovereign power and legitimate, it must be surrendered; there is an end to that doctrine.

This brings us to consider the question in hand. While the insurrectionary government of this State was waging war upon the United States, having thrown off the authority of the Constitution; while it was a member of another government established by its means, and for the purpose of more effectually subverting the authority of the United States, *existing under a constitution framed* upon the fundamental idea that the Constitution of the United States should no longer prevail in this State, and acknowledging a different government as having supremacy here, and at a time when these purposes and objects were so far successful, that the authority of the United States was silenced and repelled,—this insurrectionary government, in order to maintain itself in its attitude of hostility, and to meet the exigencies of the war which it was waging, adopted a financial scheme, and entered into an engagement, by which it bound itself to receive certain issues of paper money for its taxes, and undertook to bind, and *in form* did bind, the State of Mississippi to receive them for all future taxes and State dues.

It is now claimed that this engagement binds the State of Mississippi and the rightful government to that extent, that the incoming government cannot refuse to receive these issues for taxes, nor pass any revenue law by which they are excluded; because the Constitution of the United States protects these engagements of the rebel government, and any attempt to evade them by the rightful government would violate the Constitution of the State and United States, which denies to the State legislature the power to impair the obligation of contracts.

The Constitution of the United States did not recognize the

Samuel B. Thomas, Sheriff, v. Wm. B. Taylor.

government which entered into this engagement at the time it was entered into, nor did that government recognize the Constitution of the United States. It originated in violation of the Constitution of the United States, and at the time this engagement was entered into had successfully thrown off its authority. Its very existence was treason. Can the Constitution of the United States be invoked to preserve and protect the engagements of a government whose very existence was an open defiance of that Constitution, and whose history was a war to subvert it?

The revenue system framed to uphold and support this un-. constitutional and rebellious government (I use the language of the statutes of the United States, not my own) was as clearly unconstitutional as the machinery it was designed to keep in motion.

The revenue system perished with the government which adopted it. The government which entered into the engagement has ceased to exist, and the engagement perished with it.

The incoming rightful government is not a continuation of the usurping government, nor its legitimate successor. They are not identical, nor is there any legal connection between them.

. The constitution of the State of Mississippi was framed with reference to the Constitution of the United States, and formed part of the system of government which that Constitution established. The constitution of the insurrectionary government was framed with reference to a different constitution and government; and the government which it established did not exist under the Constitution of the United States, and was not in accordance with it. It was a distinct government, if government at all, from that which existed under the old constitution of the State, and is distinct from any government or authority which the Constitution and laws of the United States may recognize here at this time.

To hold that it is the same government which existed before 1861, and which now exists or may be established by rightful

authority hereafter, is to confound all the distinctions between legal and constitutional government and illegal and insurrectionary combinations.

Therefore the old State constitution, thrown .off and abandoned, cannot be invoked to uphold the acts or engagements of the government erected in opposition to it and by which it was displaced.

It would be to uphold a dangerous heresy to admit that the usurping and insurrectionary government, attempting to displace the rightful government, had equal authority to bind the State that is possessed by the rightful government. Foreign nations dealing with a *de facto* government of another independent nation may, if they can, compel the rightful government, when it comes in, to respect the engagements and to be responsible for the acts of the *de facto* government; but this is a different question altogether.

When, in 1865, the insurrectionary government was blotted out by military force, because it had no authority to act for, or to bind in any form, the people of the State, its tax system, its contracts, and its laws perished with it. It had exercised an authority founded only in force, and which could not therefore survive the power which sustained it. To admit that its laws survived it and that its engagements bind the legitimate government, is to admit that its authority was legal and constitutional.

The utmost duration of its authority was the duration of its power to maintain itself.

These considerations serve to show that the contract created by the Act of 1861 with the holders of cotton money could not be recognized by the Constitution of the United States; that it would be monstrous to assume that the burdens which the insurrectionary government laid on its revenues in the course of its war against the Constitution were by that Constitution fastened upon the revenues of the rightful government; that the contract perished with the power that made it; that the usurping government had no authority to bind the people of the State. These conclusions are not only logical deductions

from the admitted facts, but they result from the position of the government of the United States, the only legal authority now existing in Mississippi, towards the insurrectionary government.

The holders of cotton money knew that they were contracting with a government not recognizing the Constitution of the United States. They knew that that government existed in violation of that Constitution. They did not trust it on the *faith* of *that Constitution*, but on the faith of the Confederate *constitution*.

At the attempted reorganization of the rightful government, in 1865, there was therefore no obligation resting on the State of Mississippi that cotton money should be received in payment of all taxes and State dues. The rightful authority was free to deal with the acts of the defunct government as it chose.

The question arises as to the influence which the Convention of 1865 had upon the acts and engagements of the government which had been overthrown. *Proprio vigore* these acts had no binding force, and it is manifest that the Convention of 1865 viewed them in this light, because, supposing themselves to possess rightful authority, they proceeded to deal with these acts without restraint, and upon the idea that they possessed no vitality.

In the first place, the authority of the Convention of 1865 to act for the State and people of Mississippi has been practically and emphatically denied by the government of the United States and the courts cannot gainsay the fact.

The government which it erected has been overthrown. It has no power to make or alter laws, and this is decisive as to its being a government. The judicial department alone remains, and that is a mere apparatus which the military commander may employ or not as an instrument of administration.

It is provisional for purposes of administration. The language of the Act of March in regard to the then existing governments is significant,—"subject to the right and power of Congress." Congress has no power over a State government rightfully established, and the fact that Congress asserts control over

the machinery now existing here, is perfectly conclusive on the question as to whether this is the *established* government of Mississippi, capable of binding the State as to the exercise hereafter of its full sovereignty. The body of municipal laws remains, of course, and it may be proper to consider that in respect to laws ratified or enacted, so far as they relate to the indifferent subjects of legislation,— such as the suspension of the statutes of limitation, the rule by which certain class of controversies are to be adjusted, and modification of the municipal law, which have been made with no direct reference to the past, but suggested by the exigencies of the present,— the courts may properly treat them as laws. But in the attitude which the government of the United States has assumed toward that convention and the government which it attempted to install, this court would transcend its legitimate power to undertake to invest it with absolute power to bind and fetter the future *political power* of any government which may be rightfully established here. That convention could not fetter the power of the rightful government over its revenues — that absolute and uncontrollable discretion in regard to its revenue which every government possesses. The power to tax, and the power to prescribe what shall be received for taxes, is one of the attributes of political sovereignty; and to admit that the convention of 1865 possessed the power to lay restrictions upon this power of the rightful government, is to admit what Congress has solemnly and deliberately denied.

The convention, however, did not *intend* nor did attempt to fetter the political power of the government which it set up. Nothing is clearer than that the convention intended to leave the question of the engagements entered into by the government which had existed without authority, and had perished, to the sound discretion of the legislature which it called into being, and which was to meet in a brief period. By a general ordinance it confirmed certain acts and disaffirmed certain acts of the insurrectionary government, but reserved, in regard to the acts confirmed, without exception, the right in the legislature to repeal the same. The legislature put this construction

on the ordinance. Ordinances and Resolutions Conv. 1865, pp. 39, 40.

All laws confirmed are confirmed with this condition purposely inserted to show that the convention did not intend the confirmation to be in the hands of the legislature. Did any man dream that that body intended to saddle irrevocably the empty treasury of the State with the enormous amount of cotton money afloat?

No one can look at the subject with its amplications without experiencing a positive conviction that it was intended to leave it to the only body which could properly deal with it. It is not a question which the courts can deal with or ought to deal with.

The convention made no pledge to the holders of cotton money. It did not pledge the faith of the State. It laid no restrictions on the power over the revenue, and that whole subject rests where it ought to rest,—*with the future rightful government.*

The idea that an "illegal combination of rebellious persons," holding, temporarily, power and supremacy in the State, can fetter the rightful government in its most important attribute of political sovereignty, the taxing power, is a figment of the brain, a wild vagary of the imagination.

It is to be observed, that since the decision of *Boyland* v. *Hill*, 40 Miss., the Supreme Court of the United States, in 6 Wallace, p. 13, has declared with emphasis, that the insurrectionary governments and all their proceedings were illegal, null, and void; and since that date, the Congress of the United States has pronounced definitely as to the authority of the government created in 1865.

The attitude of the United States towards the so-called rebel government of Virginia illustrates in a most significant manner the view which the political department of the government takes of the insurrectionary governments of the States.

In that case Congress decided that the rebel government was not the government of Virginia, and recognized the Wheeling government as having power to bind the State against the

consent of any and all pretended governments in the territory of that State.

The condition of things under the insurrectionary governments was widely different from the case of a State in accord with the United States, and acknowledging the Constitution of the United States, violating the Constitution by a legislative enactment, under a misapprehension of power. The insurrectionary governments did not acknowledge the Constitution at all, and their resistance was a defiance of it.

The views expressed in the foregoing argument are based upon the facts of the history of the late civil war, and the laws and other public declarations of the government of the United States, and are intended to develop the status of the late government, as fixed by that government. That government has not left the solution of the questions arising out of our political complications to theorists, or politicians, or courts. It has not conformed, or acquiesced in any of the acts of these temporary governments. It *is* now the rightful authority here, and has distinctly said there has been no authority to deal with the past, and is preparing to establish a government which can properly deal with it. Until that time arrives, it seems to me there is no power here to determine whether the acts of the rebel government, or that established in 1865, have had the effect to circumscribe the necessary political power of the government which is to come.

The question as to whether the cotton notes are bills of credit, I do not discuss; the government which issued them had no authority to bind the State. It was not under the Constitution of the United States, and the principles of that Constitution were not applicable to it in the matter of bills of credit.

There is much stress laid on the bill of repudiation: there is no repudiation here. The future legislatures may redeem the notes or not, as they may deem best for the interest and honor of the people; but the decision of the question by this court in no wise affects the matter. What I contend for is, that there does not exist, and according to the declaration of Congress there has not existed, any power to determine the course of the

State in regard to the engagements entered into by the late rebel government, so called.

*George L. Potter* and *Johnston & Johnston*, for defendant in error, contended:

·I. That the cotton money was not "bills of credit," and cited *Craig* v. *Missouri*, 4 Peters, 410; *Briscoe* v. *Bank of Kentucky*, 11 ib. 257; *Darrington* v. *Bank of Kentucky*, 13 How. 12; 1 Kent's Com. 439; *Curran* v. *The State Bank of Arkansas*, 15 How. 304; *Osborn* v. *Bank of U. S.*, 9 Wheat. 338.

II. There is no pretence to say these notes were issued in aid of the rebellion. The statute was passed, as it shows, during the Federal blockade, at which time a rigid non-intercourse was also enforced. The planters were thus cut off from their usual customers for the sale of their cotton; and this plan was devised to enable them to obtain advances on it. It was solely for their benefit. No part of the money was to go to the State. It is true, this paper was receivable for taxes; but that provision was inserted simply to give it currency, and it was restricted by its very terms, so as to exclude the idea that it was to constitute any part of the military fund. They were not receivable for " the military tax."

They were to be issued only as an advance on cotton *raised in this State, and raised in* 1861.

Other measures had been provided to raise a military fund. In the previous month of January, the Secession Convention had authorized the issue of a million of dollars for war purposes. Journ. Conv. pp. 126–7; Acts, Nov. 29, 1861, p. 45.

By the Act of January 29, 1862, two and a half millions more of treasury notes were to be issued for war purposes: p. 286, §§ 1, 2.

The State might, as she did, issue her warrants for military expenses, to any amount necessary; and we can see no reason why resort should have been had to this cotton transaction for such a purpose.

In January, 1862, an act was passed, authorizing the estab-

lishment of several banks of circulation, having an aggregate capital of several millions of dollars ; and they were to be cotton banks. Acts, 1861–2, pp. 147, 161. The notes were receivable for all State, county, and municipal taxes : p. 163, § 32. Here were provided a number of banks, whose issues were to form part of the paper currency, whilst a leading object, as in the issue of the cotton notes, was to enable the planters to obtain advances on their cotton ; but it will hardly be contended that this act for incorporating banks contains any clause from which it can be inferred that the purpose was to aid the rebellion. Their issues were to be receivable in payment of taxes ; but that provision was but a repetition of old legislation. A like clause was in the old charter of the Planters Bank.

The State has been accustomed, from time to time, to declare what paper issues shall be receivable for taxes, during most of the time since it was created.

The State was not the war power. The Confederate government was looked to as the party to maintain the war, and its issues of paper, for that purpose, were abundant.

It is true, the people were called on to pay taxes, and they were compelled to provide the necessary funds ; and this provision of cotton notes was a convenient mode of enabling them to raise money to pay State taxes, except the war taxes, and also to obtain the means to pay debts, purchase necessary supplies, etc. Cotton was low, and the demand was limited. If compelled to sell to raise money, the cotton of the planters would be sacrificed. But it was anticipated that, on removal of the blockade, the price of cotton would be high. It was therefore a most wise policy to so provide as to enable the planters to meet present wants, without forced sales of their cotton and other property ; and thus to save their crops for a time of high prices.

It is manifest that the fact that the notes might be used, in part, to pay taxes — even war taxes — would not affect the validity of the issue. If the planter had *sold* the cotton to raise the money to pay taxes he was forced to pay, no one would pretend that such a sale was in aid of the rebellion. If he had

mortgaged the cotton for a like purpose, no one would object to it as invalid. And, surely, this *pledge* of cotton to raise funds for the general use of the planter, no part of which he was bound to apply in payment of taxes, must be regarded as free from this objection. If not, then every act of industry and adventure for money, done during the war,— all planting, mercantile and mechanical operations, all trades and sales, all professional engagements, etc., etc., all dealings, transactions, and labors for money, even to the call and settlement of preach-, ers for salaries,— may be tortured into acts done in aid of the rebellion. For all parties were taxed, and funds were needed to pay the taxes; and each party sought, in one mode or another, to raise the money to pay the taxes, and thus save his property from seizure and sale; and the same arguments may be urged to invalidate their dealings, as are urged to show that this pledge of cotton to obtain "advances," for general purposes, was an illegal scheme in aid of the rebellion. By the same sort of argumentation, the learned counsel may as readily prove that all children begotten in the Confederacy are illegitimate, being begotten and conceived in aid of "Bill Arp's" plan to maintain the rebellion, by production of "boy babies."

As part of our history, it is known that for many years before the war the people used the bank notes of other States as their currency. We had no banks. The foreign bank notes were brought in as proceeds of cotton, and again sent out for supplies. But this influx ceased with the sales of cotton. This plan to issue these notes was devised for the relief of the planters, and, as the statute shows, to enable them to obtain "an advance on their cotton," which they could not then sell. It was, in no sense, a part of the financial system of the State devised to aid the rebellion. For its war purposes, the State could, and did, issue its own treasury notes, payable out of its own funds. It used such notes in making its payments, but never had an interest in one of the cotton notes, except when paid in for taxes.

III. Again, they argue that the State legislature was an illegal mob, and that the statute authorizing these issues was but

43

the resolution of an unlawful assembly.   They do not deny that persons were elected to the House and the Senate, or that they met, and organized, under the statutes, as the legislature of the State.   They were members of, and constituted, *de facto*, the legislature.   Their acts were done as *acts of legislation*, as " official acts," and are valid as such, by express provision of the Code, p. 138, art. 194.

Elected pursuant to the constitution and laws of the State, why were not the members of that body the legislature of the State?   Is it said the State had seceded?   We deny it.   A void ordinance cannot dissolve legal bonds.   Is it said the State had joined the Southern Confederacy?   We deny it.   The Federal Constitution prohibits such an attempt, and the act is void: art. 1, § 10.   Restrained by that instrument, the States possess only part of the functions of independent States.   They are bodies politic, with limited capacities, and, like other bodies in like predicament, they cannot do what they have no capacity to perform.   Under the Constitution, a State of the Union has no more capacity to " declare war," or to " engage in war," except in the special case provided for, than has a county or town of the State.   Acts of war done in the name of such a State, like similar acts done in the name of such county or city, are but the unauthorized acts of the individuals who engage in them.

Acts of attempted secession, or of war, by such State, are void, — but void only as being repugnant to the Constitution. They stand precisely like other attempted State acts which are repugnant to that instrument.   What is the position of a State that has attempted to do such void act?   But one answer, in law, can be given; and that is, such State, so attempting a forbidden, void act, still possesses all its constitutional capacities as before the attempt.   Missouri violated the Constitution when it attempted to issue bills of credit; and Mississippi, when it attempted to prohibit the transfer of the bills receivable of the banks; and Ohio, when it attempted to tax the Bank of the United States.   But those void acts did not affect the Stateship of either of these bodies politic, or their capacities to perform acts of legislation permitted them under the Federal

Constitution. This fact has been recognized, continuously, by the Federal Government ever since the dates of secession. Thus, in the matter of West Virginia, the Congress was careful to secure the consent of a body that it recognized as the legislature of the State of Virginia; although that legislature, so called, was elected, if elected at all, after the ordinance of secession, and pending flagrant war. Under the Constitution, ' the consent of the legislature" of Virginia was indispensable to the formation of the State of West Virginia (art. 4, § 3); and Congress recognized as a fact that such legislative consent had been given. It thus recognized as valid an alleged enactment of that State *made during the war.* Act, Dec. 31, 1862, p. 634.

Very many examples to the like effect might be cited, but we quote only one other. In the resolution admitting Tennessee, Congress declared that, pending the war, the people of that State elected and held a valid State convention which adopted a valid constitution; and also that valid elections were held and a lawful legislature assembled, which legislature ratified two certain amendments of the Constitution of the Union, and thus performed its part in making a new fundamental law to bind the States and people of the Union. All this was done without "an enabling act"—done after Tennessee had attempted to secede, and to form a Southern Confederacy, and to wage war; and done after, according to very modern phraseology, Tennessee had "been conquered back." (July, 1866.) Acts, Congress, 1865–6, p. 364.

Tennessee was represented in Congress for long after the attempts at secessions, foreign confederation, and war by that State. President Johnson was elected Vice-President in 1864, as a citizen of that State; is recognized by all the departments as lawful President; and to be such, he must have been a citizen of a State of the Union. Amendment, art. 12.

The most solemn legislative act that a legislature of a State can perform is the ratification of proposed amendments to the Federal Constitution, and the Congress admits that these Southern States may perform such acts before they are admitted to representation in Congress. Nay, it requires such ratification

as a condition precedent to the restoration of the old political relations, manifested by actual representation, that existed between these States and the Federal Government before secession.

*Capacity* to perform legislative acts has been admitted over and over. The reconstruction acts admit the continued existence of legislative enactments made during the war. They recognize the existing State governments as organized when those acts of Congress were passed. Congress, indeed, claimed the power to change or abolish them, but recognized them as *existing ;* and in this State, the State government is still *continued.* Your Honors, appointed by the commander, sit only as judges of the old State that vainly attempted to secede, and to confederate, and wage war. Sitting as such judges, you administer *the laws of Mississippi ;* among which you have repeatedly recognized enactments made during the war, and decisions of the courts made since secession.

No distinction has been made, and none can be made, except as to matters in aid of the rebellion. The 41st volume of our Reports is full of proofs conclusive on this point. Judgments rendered during the war have been treated as regular judicial proceedings. In *Lester* v. *Harris,* the County Court law was recognized. In *Mobile & O. R. R.* v. *Mattan,* the acts providing for district terms of this court was considered as an enactment of a lawful legislature. In *Licks* v. *The State,* a liquor law passed in November, 1865, was held valid. In the late *Leake county case,* the ordinance of the State Convention of 1865 (scaling values of money) was held valid. In *Frazer* v. *Robinson & Daniel,* the case of *Green* v. *Sizer* was held to be of conclusive authority, although it was decided by what counsel must call " a lawless court." The 40th volume of our Reports, so often quoted, is full of such cases. It is only by force of an act passed during the war that your Honors are permitted to draw your salaries in full, if you fail to hold court for *nine months,* yearly, should business so long require. In the case of *Mobile & O. R. R.* v. *Mattan,* this court recognized as valid the

amendment of the Constitution, made in 1865, in relation to the terms of the court.

Why all this? Either because acts, whether legislative or judicial, done during the war were valid, if they were such acts as might be lawfully done before secession; or, because the Convention of 1865 continued those acts as valid; or because the reconstruction acts continue all these in present force as existing enactments and decisions. It was not the purpose of Congress thus to continue the *officers* merely without laws to be enforced, but to continue both officers and laws for the time being.

The opposing argument cannot be limited to acts done before the surrender, but applies with equal force to subsequent acts —at least to those done before the date of the reconstruction acts. If, as counsel asserts, "we have now no Governor," then are your Honors *no court;* for the incumbents hold by the same appointing power, and yet you sit *as a court of Mississippi,* and not as a Federal court. If the legislature of 1861 was illegal, the same is true of the legislatures of 1865 and 1866, and also of all the courts held in 1865 and 1866; and of the Convention of 1865 ; for during all that time the disruption of Federal relations continued, and the ban of insurgency had not been removed.

The conclusive force of the precedent of the Virginia statute cannot be avoided or weakened by the suggestion of counsel, that the legislature which thus gave its consent was "a loyal legislature." At that time there were, indeed, two bodies of men in Virginia who severally claimed to be *the legislature* of that State, and Congress decided that one of them was the lawful legislature. Its members may all have been "loyal," but that does not affect the question. That was but a reason for the choice between the two contending organizations in that State. The fact remains, that at that time the State of Virginia, with the exception of the small district of West Virginia, was in the precise position of Mississippi. Both States had attempted to secede; and the mass of the people of both States had been proclaimed to be in a state of "insurrection" to Fed-

eral authority. And after that time, the alleged " loyal legislature " was elected, and it passed the act in question as a solemn legislative act, without any permission or authority given by Congress; and Congress by its subsequent action treated that statute for the creation of a new State in Virginia as a legitimate exercise of legislative power on the part of the State, and as possessing the like operative force as though it had been passed before the year 1861. At that date, too, Virginia was the great theatre of the war; but the Congress rightly held that the circumstances adverted to did not impair the rightful powers of the State to legislate as aforetime.

The State government of Virginia was afterward overthrown, as was the case in Mississippi; and both States alike were placed under military control. The parallel is complete. As to the matter of " loyalty," the courts cannot inquire. If the legislature of Virginia was " loyal," who shall say the legislature of Mississippi, in 1861, was not loyal? What court can undertake to try and determine the questions as to the sentiments of the voters or of the members elect? Tested by any sound rule, the legislature of Mississippi, *elected before the war*, was, in 1861, at least as loyal as the legislature of Virginia in 1862. But Congress wisely recognized that, under our system, the States of the Union have two relations — the one *domestic*, as relating to their own people; and the other *Federal*, as relating to the Federal government. All of them were States, first, and *afterwards* they became *States of the Union*. The sovereign State of Texas was admitted into the Union under *its* previous State government, which continued unchanged, and remained as before, *the same State government*. By the fact of admission the political relations of the State to the Federal government were changed, and its powers of legislation, etc., became restricted by the Federal Constitution. But, nevertheless, the old State, and the old State Government, though placed in new relations, still existed; and when, afterward, its political relations to the Federal government were suspended, the State government still continued, with all its powers of local government. As was the fact recognized by Congress in

the case of Tennessee, the States may be States in the Union, and yet not be States having certain constitutional relations to the Federal government. Those relations may become suspended. Thus, if senators and representatives in Congress, to which a State is entitled, be not appointed and elected as the Constitution requires, a most important relation of such State to the government is suspended. It does not participate in Federal legislation. But such suspension of the Federal relation does not change the position of the State as a State in the Union, nor affect in the slightest degree its powers of State government. It will still possess all its powers of local or State legislation. And this must be true in every case of such suspension of Federal relations, no matter what may have been the cause or motive producing the suspension of such relations.

The several States have powers of LOCAL legislation. They, together, participate in Federal legislation. But these are separate and distinct functions ; and they are not at all dependent on each other. It is therefore true that a State of the Union may exercise all her powers of local legislation at the time when, by reason of the suspension of its Federal relations, it does not participate in Congressional legislation.

We may add, that a change of State officials, or a change of the State government, does not affect the relations of the State to the Federal government, nor impair its power of local legislation. And it is immaterial whether such change be produced by revolution, or otherwise. Thus the Dorr government of Rhode Island would have stood as the government of that State, if it had been sustained by the Federal government; although it was revolutionary in its origin.

So *the people* of the States bear two relations. They are, directly, subject to State and Federal legislation, and are under *two governments* — the laws of each operating directly upon them. They may be loyal to the one, and not to the other ; in insurrection against the one, and not against the other ; traitors to the one, and not to the other. Acts done by them against the one government would not affect their relations to the other. In the case under consideration the statute was not

enacted by persons hostile to the State, nor by usurpers of any right or power of either the State or the people.

It is necessary to the Federal government that the States, or a sufficient number of them, shall participate in Federal legislation; and it is a matter of common interest to the people of the whole Union, and to the government, that each State shall have just and wise laws, tending to preserve the peace, and promote the prosperity of its people. The common whole is interested in the prosperity of every part, and it is to the interest of the Federal government that a State shall have proper laws, even though its Federal relations be suspended. There never was a time, during all the war, when it was the interest of the Federal government that the people of Mississippi should be without a State government, or without officers; or without a legislature, and proper and necessary local legislation. Although there was rebellion in this State, it was never the interest or the policy of the Federal government that our people, either the innocent or the guilty, should be reduced to a condition of anarchy, or be deprived of their constitutional powers of local self-government. On the contrary, it was the continuing duty of the United States, during all the war, to guarantee to every State "a republican form of government." All this shows conclusively, that, pending the rebellion, the State governments might well exercise their accustomed powers; and that this Act of 1861 was properly enacted, if not repugnant to the Constitution.

We remark, further that, a change of rulers, or of the *form* of government, does not affect THE GOVERNMENT of the State. Counsel presents the strange idea that in such a case "*the government* ceases to exist." But in all such cases the government, however changed, or by whomsoever administered, is still *the government of the State.* The acts of such government are valid as *State acts,* and debts created by it bind the people and the rulers who may afterward administer the government.

The *de facto* government for the time being is the govern-

ment of the State, and its treaties, and the debts created by it, are valid and binding. 1 Kent's Com. 27, 167.

Acts done against an usurping *de facto* ruler, which would be treason if done against the rightful prince, are acts of treason, and punishable as such, under the general laws, and will be so punished, even after the rightful prince regains his power. 8 Bacon's Abridg. 12 ; 3 Coke's Inst. 6, 7.

Mexico has had repeated revolutions, by which the very frame of its government, as well as its rulers, has been changed. France, England, and other States have had such revolutions. But none of them have destroyed *the government* of the State ; and such changes have neither impaired the force of treaties nor the rights of public creditors. It was upon this principle that Congress seems to have acted in the cases of Tennessee, Virginia, etc., before cited.

Let us consider the case more closely.

Mississippi was a State before she was admitted into the Union. Code, pp. 21–22. She came into the Union as a State, and upon the footing of the original States, which existed before the adoption of the Constitution.

The several States possess all their powers, as powers inherent in States ; and derive none of them from the Federal government, nor from the Federal Constitution. Restrained and limited by that instrument, they cannot exercise powers that would otherwise belong to them. "Their political relations in the Union" are but restraints — abridgments of the political powers that belong to independent States. It is therefore idle to pretend that the underived powers of a State of the Union are *diminished* by the suspension or dissolution of its "political relations in the Union." If it were possible for a State to secede, and thus destroy those "relations," it would possess the full powers of a sovereign and independent State. As the State powers of legislation are not derived from nor dependent upon the Union, the government, or the Constitution, it follows that State powers of domestic or local legislation must continue in full force, whether the relations of the people of such State be hostile or friendly to the Federal gov-

ernment.    If New York were expelled from the Union, would such expulsion *impair* her powers of legislation ?

The State governments are for the local people, and the Federal government cannot administer them, nor prescribe the qualifications of the persons who shall administer them.    Until the recent amendment of the Constitution, there was no restraint upon the people of a State in their elections to State office, except such as might exist in the State constitution.    It is therefore folly to talk of "usurping governments" in the State, when such governments are organized and sustained by the people.

A "usurping government" must exercise powers belonging to another, and the usurpation is limited to the very powers usurped.    When a legislature passes an unconstitutional act, it usurps power to that extent only ; and such usurpation does not affect its rightful power to legislate.    When a majority of the people united to elect members to the legislature during the war, under the old laws, in what sense could such a body be regarded as *usurping* over *the people of the State ?*    It might claim powers forbidden by the Federal Constitution, but the usurpation would be limited to those powers.

On the 9th January, 1861, the State of Mississippi had a lawful, recognized government.    Its legislature, elected on the first Monday in October, 1859, continued in office until the first Monday in January, 1862.    Code, p. 39, amendments 4 and 5.

That legislature, thus elected and organized in peace, passed the act calling what is known as the secession convention. Lawfully elected persons constituted that legislature ; and lawful officers, elected in October, 1859, or before, exercised the powers of State government when the ordinance of secession was adopted ; and they continued to hold until the first Monday in January, 1862, or longer.    They were lawfully elected to discharge the duties of offices created by the Constitution, and to perform functions that such State officers might lawfully exercise, under the Federal Constitution ; and yet, a government thus constituted is to be denounced and

ignored as "*usurping*"! It is vain to pretend, with regard to Mississippi, that a like state of facts existed as was recited by Congress respecting Tennessee : "Whereas, in the year 1861, the government of the State of Tennessee was *seized upon* and taken possession of by persons in hostility to the United States," etc.   Resolution, July, 1866, p. 364.

In Mississippi, the State government was not thus "*seized;*" but the offices of the government were lawfully held by persons duly elected to fill them; and these persons continued in office until after the passage of the statute under consideration.

The void ordinance of secession did not impair the lawful powers of the State government.   6 Wallace, 450.

The unauthorized and unlawful acts of State officers cannot impair the lawful powers of the State government, nor affect the validity of its authorized acts of legislation.   Much less could the unlawful acts of the persons composing the *State convention* affect the enactments of *the legislature.*   Persons "in hostility to the United States" might, as in Tennessee, "seize" "the State government;" but that would not affect its validity, and the question of "usurpation" would be a matter for the people of the State only.   The attempts of the secession convention to change the constitution, in order to sever State and people from the Federal Union, were simply inoperative and void.   The State Convention passed another void ordinance to make Mississippi a member of the Southern Confederacy; but this void act of the convention did not impair the lawful powers of the State government, nor affect the enactments of the legislature.   So, unconstitutional, or unauthorized or hostile acts of members of a legislature, do not impair its powers to do lawful acts.   All this is admitted by the resolution restoring Tennessee to her political relations, etc.

Under our system, acts done in contravention of the Federal Constitution, either by persons constituting the State legislature, or holding other State offices, are *void.*   They are not legislative or official acts — are not *State acts;* and, in the nature of things, *cannot be.*   There may be a hostile person in office as Governor, and hostile persons may compose the legislature;

but their hostility is not *official*, nor can their unlawful, hostile acts, be regarded as *State acts*. They are *personally* liable for such acts, and cannot shelter under authority of the State. But if their acts were official State acts, they would not be personally responsible.

This was the view taken by Congress, in the Act of July 13, 1861, p. 255.  It provided for the collection of the revenue "in cases where," by reason of *unlawful combinations of persons* in opposition to the laws of the United States, it was impracticable to collect in the ordinary way. · § 1.

Before this date, the State convention by ordinance of the previous March, had professed to unite the fortunes of Mississippi with the Southern Confederacy; and at the date of this act, certain presuming persons were in the Congress, so called, at Montgomery, professing to represent the State of Mississippi. But notwithstanding the void acts of the convention, and the conduct of zealous men claiming to personate the State, the Federal Congress persistently regarded Mississippi as under political coverture—inseparably wedded to the Union, and as incapable to do or authorize such acts as a femecovert would be. The Congress regarded all such acts as done by "unlawful combination of *persons*," and not as State acts.

The same view is taken in the fifth section, which provides for proclaiming the inhabitants of States, or parts of States, "in insurrection." Provision is made therein for the case where "said insurgents *claim* to act under the authority of any State or States, and such claim is not disclaimed or repudiated by the persons exercising *the functions of government in such State or States*," etc.: p. 257. Here we see that "the functions of government" in such State are admitted still to exist, notwithstanding the secession and confederation attempted in the name of the State.

The same view appears in the Act of Congress of Aug. 5, 1861, p. 292.  The eighth section imposes and apportions a direct tax on all the States.  "The State of Mississippi" is to pay so much: pp. 294–5. She was to be *taxed* as a State in the Union; but the pretence is, that she was a State deprived of

all the powers of such a State — a State in the Union without power of State legislation! What a queer Union is that! What a remarkable nondescript of a State,— an organized political nonentity, incapable to exercise any one power of a State!

But Congress did not so consider. When it proceeded to apportion *a direct tax* under the Constitution, against Mississippi, as a State of the Union, it meant the same State admitted into the Union in 1817, as a co-equal State, possessed of its old power of legislation.

By the fifty-third section, "any State" might "lawfully assume, assess, collect, and pay into the treasury of the United States the direct tax, or its quota thereof," " in its own way and manner, *by and through its own officers, assessors, and collectors ;*" and might "*make any laws* or regulations for these purposes." And notice of such intent to assume the collection of the tax was to be given "*by the Governor or other proper officer*" of the State: p. 311. Here we have the full admission of "the political department of the Federal Government," that, notwithstanding the void ordinances of secession and confederation, etc., the Southern States still existed with their old capacities, having "governors" and other "officers," and legislatures competent to "make laws." Opposing counsel stigmatize governments thus recognized by Congress, as "usurping governments"! Another calls them "revolutionary"! And yet their chosen inspector and judge, "the political department," recognized them as old-fashioned State governments, and authorized them to become its tax collectors.

It is true, the fifty-second section provided, that if "any of the people of any of the States" should be "in *actual rebellion*" "at the time this act goes into actual operation," so that the laws of the United States cannot be executed therein, the President was "to proceed to execute the provisions of this act within the limits of such State, so soon as the authority of *the United States* therein, is re-established :" p. 311. But this provision does not impair the argument; for the fifty-third section was to be enforced, if, at the time fixed for the operation of the act, the people of the State were not "in actual rebellion;" and

it was to take effect, at all events, as soon so the authority of the United States was " re-established " in such State. The State authorities were regarded as at all times competent to act; but the difficulty was such opposition of rebellious men, that the law " could not be executed therein." The act of Congress did not, as counsel assumes, look to the time when *the State* authorities or goverment should be " re-established," but to the time when " the authority of *the United States* therein is re-established."

The act for declaring the inhabitants of States to be in insurrection made no declaration against the State governments then existing therein; but only prohibited " commercial intercourse " with them by citizens of other States. Act, 1861, p. 257.

The sum of the matter, as declared in the resolution restoring Tennessee, is, that the acts of secession, confederation, etc., notwithstanding the powers of local self-governments under the Constitution, still remained to those States; but the Congress holds, that, by the Statute declaring the inhabitants of the State to be in insurrection against the United States, " the former political relations " of such State " in the Union " were *suspended*, and could be " *restored* " only by consent of Congress.

But it is argued that, during the progress of the rebellion, the people of those States were deprived of " civil government." How ? Why, only by the expulsion of the State and county officers by the military forces of the United States; and this did not take place in Mississippi until after the surrender.

Void or hostile ordinances and acts do not impair valid constitutions and laws. The old Constitution and laws remained in force, including the election laws. They required elections to be held, and they were held; and now the pretence is, that those officers elected according to the Constitution and laws, and required and sworn to act, had no lawful authority to discharge the functions of their offices.

The resolution restoring Tennessee is significant in another important particular. It first recites that " *the State government* of *the State* of Tennessee" was " seized upon " in 1861. It then

recites that *the people* were proclaimed to be " in insurrection," and that in February, 1865, the people remodelled their constitution, elected State officers, and a legislature which ratified the two proposed amendments to the Federal Constitution, etc., etc.; and then declares " *the State*" — the old State — " restored " to her old relations. It recognizes " the State government " as *still continuing*, after it had been thus " seized upon and taken possession of " by hostile persons ; and " that State government " as still existing at the date of the resolution of Federal relations by representation in Congress.

The true doctrine is that for which we contend, and the opposite argument dissolves civil society. If the legislature could not act during the war, so neither could the courts or executive officers of the State. There could be no arrests of offenders, no punishment of crime. There could be no lawful marriage ; no valid official act done. And all this train of terrible evils is to follow in a state of case where the people of Mississippi were recognized by the Federal authorities as belligerents, and cartels for exchange of prisoners were established. These last were established " from motives of humanity," " to mitigate the horrors of the civil war ; " but what sort of " humanity " is that which would judicially create a state of utter anarchy throughout the South during all the war, and leave even the women and children without law, and helpless victims of every assailant ?

Until judicially convicted, persons in rebellion may hold office and do valid acts as before their offence, except that they cannot convey, and avoid a forfeiture.

There was no law preventing a rebel from holding State office ; nor can any court inquire into the qualifications of members of a legislature, and thus find causes to annul laws.

Each house is the judge of the election and qualification of its members, and no court can try the question where a member was sworn, or otherwise invade the province of the body itself. The doctrines declared by this court in *Green* v. *Waller* settle this point. 32 Miss. 650, 686.

As lawyers, we are bound to hold, that, notwithstanding her acts of secession, etc., the State of Mississippi possessed at the

date of this statute all her accustomed powers of legislation ; and that, notwithstanding the state of rebellion, lawful state elections might be held, and acts be done by the State representatives and officers, precisely as before in a state of peace.

We are also bound to say, that, during all the war, the Federal Constitution was still in force here in Mississippi (*Mauran* v. *Ins. Co.*, 6 Wallace, 13, 14); and it is in vain that counsel pretend we cannot now invoke it to protect our contract against the provisions of. the Revenue Act of Mississippi, adopted after the surrender, in 1865.

What is the position of the Congress ? It does not assert the invalidity of such laws, but it assumes that the government of the State became disorganized, and that it cannot be restored, except by aid of Congress. It surely does not claim that the old constitution and the code have been abrogated, except in the matter of slavery ; but it assumes that . disorganization took place in consequence of removal by Federal power of the State officers and other officers, under our laws, and that the power of restoration is with Congress. Such being the case, it assumes the power to prescribe certain provisions to be adopted in order to make the government republican in form; and as part of the theory assumed, it claims to prescribe for the time being the qualifications of voters. We are not discussing the correctness of the theory, but seek only to ascertain the views of Congress as manifested by its acts. .

Certain old laws of the State are held to be anti-republican, but this statute is liable to no such objection. The " reconstructed " States have been received by Congress with their old laws, *and laws enacted during the war* still in force ; excepting, of course, such as were acts of war, or repugnant to the Constitution, and as to these Congress has made no exception. The sum of the matter is, that Congress claims certain *results* of the war — to wit, an indissoluble union, the nullity of secession and of all acts of secession or war, the abolition of slavery, and the right of Congress to " reconstruct " these States. The claims of Congress do not touch the matters of this controversy.

Samuel B. Thomas, Sheriff, *v.* Wm. B. Taylor.

The conclusion seems unavoidable, that, notwithstanding the particulars of the rebellion, the State of Mississippi continued to possess its old accustomed powers of local legislation; and that the statute under consideration was enacted by a lawful legislature. The question to the supposed suspension of its former "*political*" relations in the Union," and the right of representation in Congress, and the question of power to "reconstruct" the State government after the military had expelled all its officers, are distinct questions not necessarily involved in this discussion.

As we have seen, it is immaterial whether this State government was administered by the rightful officers, or was only a government *de facto;* the result is the same, whether we look to general principles, or to the clause of the Code making the acts of officers *de facto* operative and valid as *official acts.*

This statute is confirmed by the general ordinance in that behalf of the Convention of 1865. The purpose of that act was to guard against the possible assailment of the legislation enacted during the war. It was merely precautionary, but wholly unnecessary, as this court has decided. *Hill* v. *Boyland,* 40 Miss. 639, 640.

That ordinance of confirmation did not, as counsel argues leave to the legislature to determine on the validity of those statutes. The provision referred to was inserted only that they might stand like other valid statutes, subject to change or repeal, in cases where the legislature might act without impairing vested rights and contracts.

Counsel quotes from the speech of Judge Yerger, in Convention, to show *intent;* but the acts of that body cannot be thus tried. Moreover, the expressions referred to had relation to the warrants issued under the ordinance of the Convention of 1861, and Judge Yerger is express in the declaration that he desired to leave the question of *their* validity to the courts. Journal, pp. 223–4. If the Convention of 1865 could do nothing to bind the United States, it is nevertheless true that Congress has recognized as "provisional" the government organized by it. So long as it continues thus recognized, is it not a valid

44

government? Are the officers who executed persons condemned by its courts, murderers? Are its courts no courts; its judges mere trespassers when they order an arrest, or seizures of property? Are they liable to be sued hereafter, and compelled to refund the moneys received by them for salaries.

When Congress thus recognized and continued the State government, what did it mean? It surely intended to recognize the State officials. But what more? Those officials were to administer or execute *laws*. What laws? Why, those laws recognized as laws by the then existing government, and administered by it, including the laws enacted during the war.

They tell us that "the political power" of the government has decided this question. Yes, it declares this body of laws is to remain in force as "provisional." But the question at issue is not a political question. This question of *the validity of an alleged statute* is purely a judicial question, which the courts only can determine.

We are not called on here to discuss this plea of the supremacy of political power; but we feel constrained to say, no such power in this government can exist in the length and scope for which counsel contend. Where there are two contesting State governments, there must be a choice between them; but that is a matter wholly distinct from the attempt by Congress to overturn a State government. If, at the next session, that body should declare the existing government of Ohio "not legal," and place its people under military rule, would this plea of "political question" conclude the matter, and perpetuate the usurpation?

Counsel argues in vain, that the resolution in regard to Tennessee "declared that the government of the United States only can restore State governments." On the contrary, it recognized that the then existing government of that State, as organized by the people during the war, was valid, and Tennessee was restored "to its former relations," as thus organized.

Again, they argue that the ordinance of secession was adopted "to raise a political question;" but that is a mistake. The intent was to exercise an alleged *State right*, as against the Con-

stitution. The secessionist denies that, *under the Constitution*, the States are irrevocably united; and he insists that the union depends on the good pleasure of the States. The true union man *looks to the Constitution* for his answer, and thus arises a *judicial* question,— the exposition of that instrument when "a case" presents it.

The purpose of the ordinance was to release the State from the restraints of the Federal Constitution, and thus to make it a "sovereign and independent State." That *void* endeavor did not annul the State or its governments. Both continued, the ordinance notwithstanding still to exist; and that State government was the old State government, which, during nearly fifty years, had been continually recognized by every department of the Federal government. The "political power" had exhausted itself on that question. It is a novel and very modern idea, if it merits recognization as an idea, that a valid State government can be destroyed, or rendered "illegal" or "usurping," by force of a void act — a *nullity*.

It may be a very modern rule in some latitude unknown, that a state is not a state until recognized by other nations; but we doubt not the people of the old state of China would be amazed to find they were "no state" until the moderns were born, and consented to recognize them. All this sort of talk is too absurd to become so common as is now the fashion. Where a people have inherent self-governing powers, and make their own government, they constitute a state, and have a state government, whether other nations know it or not. Its own courts, parcel of that government, can hardly deny the fact. Congress recognized the continuing existence of the State governments, when it submitted the two proposed amendments of the Constitution to "*the legislatures* of the several States" for ratification. Its resolution restoring Tennessee admits that both of those amendments were submitted to the legislature of that State, and if so, then to all the States.

In "the Mississippi case," the Supreme Court recognized the State as an organized State, having officers capable of present-

ing her claims before that tribunal, and, as we have seen, the direct tax law recognizes the same fact.

Counsel cannot see how Mississippi could be in the Union and yet legislate for and govern, and thus hold "intercourse" with, her people, who were "public enemies" and "insurgents." He fails to appreciate that the unlawful acts of citizens do not destroy their relations to the government, nor deprive them, at least not before conviction, of their civil and political rights; he cannot see that whilst they were "traitors" to the Federal government they were still citizens of Mississippi, and as such were, by her laws, bound to obedience under the Constitution — were bound even to hold civil office, if thereto elected, but not bound nor authorized to violate Federal law. If by the laws of war "enemies" of the United States, they were nevertheless *citizens* thereof, and still bound to obedience. This matter is explained by the Supreme Court in some of the prize cotton cases.

The dictum in 6 Wallace, 13, seems to be misapprehended by counsel. The case recognizes that, during the war, there were governments *de facto* in the South. The question before the court arose upon a Confederate capture, and there was no question before the court in regard to the local State governments. The dictum must be considered as made with reference to the question before the court, which was — whether there was a Confederate government. The Southern States had attempted to confederate and form such a government, and to connect the State governments with it as States of the "Southern Federacy." And it is these combinations of governments thus attempted to be set up, and not the local State governments, to which the court referred.

We have discussed this point at length, as if it were an original question ; but it stands adjudicated, decided finally, in *Hill* v. *Boyland,* which case your Honors affirm as often as you pass upon the Statute of Limitations.    40 Miss. 618.

IV. This statute is not repugnant to art. 7, § 9 (General Provisions) of the Constitution. This was not an attempt to "raise a loan of money upon the credit of the State," nor "to

pledge the faith of the State for the payment or redemption of any loan or debt," in the sense of the Constitution. It is simply an agreement to pay money *out of the proceeds* of the cotton pledged by third parties. The Constitution is limited to cases in which the State binds itself to pay the debt *out of its own funds.* The agreement to receive these notes for debts and taxes is not a pledge of the faith of the State for the payment or redemption of any loan or debt, within the purview of the Constitution. The agreement is simply to *receive* them, and not to *pay* or *redeem* them. Such receipt for taxes was not a payment or redemption of the notes. By express terms of the act, the State might *pay them out* after such receipt, and it is plain that the proceeds of the cotton pledged were still liable for their redemption, after they had been so received for taxes.

There is a palpable difference between a promise to *receive* a note in payment and a promise to *pay* or *redeem* that note. The statute itself recognizes the difference. The State was to *receive* for taxes ; but the notes were to be *redeemed* out of the proceeds of the cotton.

V. The remaining question is, Was this bill properly filed to prevent the collection of the tax upon the fact of the tender of this cotton note, as prayed for by complainant?

There can be no serious controversy on this point. The case of *Woodruff* v. *Trapnell* settles the question. 10 How. 190. Woodruff was a defaulting treasurer of the State, and when judgment was recovered against him, he tendered the notes of the State Bank of Arkansas, which the State had pledged itself to receive in payment of all debts due to it. The notes were issued, payable to bearer, and the court held that the pledge of the State was continuing, and available to every person who might, at any time, receive the paper.

In the case of *Curran* v. *The State Bank,* 15 How. 304, the bill was filed upon the right of complainant, notwithstanding there was a statute of the State which, if valid, would preclude him. But he asserted the invalidity of the statute, as we do the Act of 1865, and recovered.

To the same point we cite *State Bank Ohio* v. *Knoop,* 16

How. 369; which was a bill filed to enjoin the collection of a tax levied by authority of a statute made in violation of a contract by the State with complainant.

PEYTON, J., delivered the opinion of the court.

The defendant in error filed his bill of complaint in the Chancery Court of Hinds county for the first district thereof, against the plaintiff in error, as sheriff and tax collector of said county, and B. H. Pitman, alleging that he was the owner and possessor of fifty bales of cotton made in said county; that he had baled and prepared for market, and was about to ship the same; that there was then due and owing the sum of two dollars per bale, for tax on said fifty bales of cotton, by virtue of an act of the legislature of the State of Mississippi, entitled "An Act levying a special tax upon certain persons and property therein named," approved November 16, 1865.

The bill further alleges that the defendant in error tendered to the said B. H. Pitman, the regularly appointed and qualified deputy of the said Samuel Thomas, sheriff and collector, as aforesaid, in payment of the tax due and owing by him on said fifty bales of cotton, a one hundred dollar treasury note of the State of Mississippi, commonly called a cotton note, duly issued by virtue of an act of the legislature of said State, on the day of the date thereof, entitled "An Act to be entitled An Act authorizing the issuance of treasury notes as advances upon cotton," approved Dec. 19th, A. D. 1861.

The bill further charges that the said treasury note, so tendered by defendant in error as aforesaid, was and is, by virtue of the said act of the legislature authorizing the issuance of the same, receivable for all taxes then due, or that may thereafter become due, to the State, or any county or municipal corporation, except the military tax, and that said act is in full force and virtue, and, by force thereof, the said note so tendered was and is receivable for all State taxes then due, or thereafter to become due, except the military tax.

The bill further states that the said Pitman, as deputy sheriff as aforesaid, refused to take the said treasury note

in payment of the said taxes, as by law he was bound to do, to the manifest injury, wrong, and injustice to the defendant in error.

The bill further charges that the said Act of the legislature, approved November 16, A.D. 1865, requiring the plaintiff in error, as collector of taxes, to collect said tax in the currency of the United States, on which the plaintiff in error relies to justify his refusal to receive said treasury note in payment of said tax, is, so far as the said act forbids the receipt of the said treasury note in payment of the said tax, unconstitutional and void, as impairing the obligation of the contract of said State to receive said treasury notes, issued under said statute, approved the 19th December, A. D. 1861, in payment of all taxes then due, or that might thereafter become due, to said State, except said military tax.

And the bill further states that the said Pitman, deputy as aforesaid of the plaintiff in error, sheriff and tax collector as aforesaid, having illegally and wrongfully refused to receive said treasury note tendered as aforesaid, has levied on a part of said cotton to pay and satisfy said tax, and will proceed to sell the same, unless restrained by the proper process of the court. And prays for the ordinary process, and also for a writ of injunction to restrain the plaintiff in error, and the said Pitman, and each of them, from selling said cotton for said tax, until the further order of the court, and that upon the final hearing the injunction may be made perpetual; and that the plaintiff in error be decreed to receive the said treasury note in full payment and satisfaction of the taxes due by the defendant in error on said fifty bales of cotton.

At the June Term of said court, 1866, the defendants in the court below appeared and demurred to the bill of complaint, for the want of equity on the face of the bill, which demurrer was overruled by the court, and, the defendants declining to answer further to the bill, the same was taken for confessed; and upon final hearing, the court perpetuated the injunction, and decreed that the plaintiff in error, as tax collector as aforesaid, receive the said treasury note in satisfac-

tion of said tax, and receipt to the defendant in error in full for said tax.

From this decree the plaintiff in error brings the cause to this court by writ of error, and makes the following assignments of error:

1. The court below erred in overruling the demurrer of the defendants to the complainant's bill.

2. The court below erred in rendering final decree for complainant.

Much learning, research, ingenuity, and ability have been displayed by the counsel on each side, on the argument of this cause; and its importance, both with reference to the interesting legal questions and principles involved, and the vast pecuniary interest dependent upon the result, demand the most matured and deliberate consideration of this court. And, in order to a correct understanding of the principles involved in this case, we deem it not improper, on this occasion, to advert for a moment to the nature and character of our system of government. And, in discussing the purely legal questions involved, we adopt as our guide on this occasion the same rule which was laid down for the court in the case of the *Louisville and Nashville Railroad* v. *Davidson*, 1 Sneed, 637, where the court says: "If the construction and administration of our laws, supreme or subordinate, were to be governed by the opinions of judges as to the genius or general principles of republicanism, democracy, or liberty, there would be no certainty in the law, no fixed rules of decision. These are proper guides for the legislature, where the Constitution is silent, but not for the courts. It is not for the judiciary or executive department to inquire whether the legislature has violated the genius of the government, or the general principles of liberty and the rights of man, or whether their acts are wise and expedient or not, but only whether it has transcended the limits prescribed for it in the Constitution. By these alone is the power of that body bounded. That is the touchstone by which all its acts are to be tried; there is no other. It would be a violation of first principles, as well as

their oaths of office, for the courts to erect any other standard. There is no higher law than the Constitution known to our system of government." So, on the present occasion, it is not for us to inquire whether the provisions of our Federal Constitution are wise or unwise, but what they are, and what is their true interpretation.

The Constitution of the United States is not merely a league of sovereign States, for their common defence against external and internal violence, but a supreme federal government, acting not only upon the sovereign members of the Union, but directly upon all its citizens in their individual and corporate capacities. It was established, as the Constitution expressly declares, by "the people of the United States, in order to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to them and their posterity." This Constitution, and the laws made in pursuance thereof, and treaties made under the authority of the United States, are declared to be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding. The avowed intention was to supersede the old confederation, and substitute in its place a new form of government. The sad experience of the inefficiency of the old confederation, which was a mere league of States, without any cohesive power or energy, forced the people of the States to surrender the league then existing, and to establish a national constitution of government, which has been the subject of different interpretations, according to political complexion of parties, with reference to the extent of the powers of the Federal and State governments; yet it is a historical fact, that, although many declarations of rights, many propositions, and many protestations of reserved powers are to be found accompanying the ratifications of the Constitution in the various State conventions, sufficiently evincive of the extreme caution and jealousy of those bodies, and of the people at large, there is nowhere to be found the slightest allusion

to the instrument as a compact of States in their sovereign capacity, and no reservation of any right, on the part of any State, to dissolve its connection, or to abrogate its assent, or to suspend the operations of the Constitution as to itself. On the contrary, the Convention of Virginia, which speaks most distinctly on this subject, and, as we think, most correctly, merely declares "that the powers granted under the Constitution, being *derived from the people of the United States,* may be resumed by *them* (not by any one of the States), whenever the same shall be perverted to their injury or oppression." Of the right of a majority of the whole people to change their Constitution at will, there can be no doubt. And when there is an accumulation of usurpations and abuses, rendering passive obedience and non-resistance a greater evil than resistance and revolution, the form of government may then be changed by *successful* revolution, an appeal from the cancelled obligations of the constitutional compact, to original rights and the law of self-preservation. This is the *ultima ratio* under all governments, whether consolidated, confederated, or, like ours, a compound of both; and it cannot be doubted that a single member of the Union, in the extremity supposed, but *in that* only, would have a right, as an extra and ultra constitutional right, to make the appeal.

The government of the Union, though limited in its powers, is supreme within its sphere of action. The international relations of these States with foreign states are exclusively maintained by it, whilst their municipal regulations and internal affairs are maintained and conducted by them. The external sovereignty, therefore, of the nation is exclusively vested in the Union, and the independence of the respective States, so far as the legitimate powers of the government of the United States extend, is merged in the sovereignty of the Federal Government.

The great question presented by this record is, whether the State of Mississippi and the rightful authority which now controls her people, are bound by the acts and engagements of the government, which was organized under the ordinance of

secession in 1861, and finally overthrown by the military forces of the United States in 1865. In order to a proper solution of this question, the precise character of that government while it existed should be first ascertained.

At the time of the passage of the ordinance of secession, the State of Mississippi was one of the States of the Union, and her constitution and government constituted part of the machinery by which the government of the United States was carried on and maintained. The government then in existence assisted to form the Senate and House of Representatives of the United States, and in the election of the President of the United States. The laws of the United States were the supreme laws of the State of Mississippi; and though the government was separate from the governments of the other States, it was not separate from that of the United States: there was an intimate connection between them, and a mutual dependence upon each other.

The government founded on the ordinance of secession was a government without any connection with or dependence on the government of the United States. It denied the authority of the Constitution and laws of the United States over the people of Mississippi, who were declared to be no longer a part of the people of the United States. This denial was accompanied by the adoption of a new constitution, in many respects like the old one, but fundamentally different in that feature of it which severed the connection of the government of Mississippi with that of the United States, and in the assertion of the absolute independence of the government of the former. The senators and representatives in the Congress of the United States were withdrawn, and all the laws by which the people of Mississippi and the government thereof participated in the government of the United States were abolished.

The government thus set on foot proceeded, in conjunction with other State governments similarly erected and controlled, to form a confederation of states, by adopting a constitution and government for the people of the States so confederating, through the agency of these State governments. The obliga-

tions and connections thus formed and incurred were wholly incompatible with those which existed under the government of the United States, of which the new Confederacy declared themselves entirely independent. It thus appears very evident that the government of the State of Mississippi as one of the United States, and the government of the State of Mississippi as one of the Confederate States, were not identical, and could not in the nature of things be the same. And although the members of the legislature of 1861 may, as counsel for defendant in error has alleged, have been elected under the former, yet it is very clear that they formed the legislature of the latter. The constitution of the State of Mississippi as one of the Confederate States, and the constitution of the Confederate States, both require that the members of the legislature shall, before they enter upon their duties, take an oath or affirmation to support the constitution of the Confederate States. The members of the legislature of that year, if they took any oath at all, must have taken an oath or affirmation to support the constitution of the Confederate States of America, according to the requirements of said constitution. The legislation of Mississippi, from the date of the ordinance of secession to the surrender of the Confederate armies, was done either without the sanction of an oath, or under an oath to support a constitution adopted in violation of the Constitution of the Union, and for the express purpose of subverting the government of the United States; either of which, we think, would be sufficient to invalidate the legislation. We are aware that our predecessors have arrived at a different conclusion in the case of *Hill* v. *Boyland*, 40 Miss. 640. The court in that case says: "That the provision in the Constitution of the United States as well as that of the State of Mississippi, requiring members of the legislature to take an oath to support the Constitution of the United States, is merely directory; and the failure to take such oath will not invalidate their action." The Constitution of the United States provides that the senators and representatives in Congress, and the members of the several State legislatures, and all executive and judicial officers, both

of the United States and of the several States, *shall* be bound by oath or affirmation to support that Constitution. We cannot think that so important a provision in the paramount law of the land was intended to be merely directory, and not absolutely necessary to be complied with. Story, in the third volume of his Commentaries on the Constitution of the United States, 702, says: "That all those who are entrusted with the execution of the powers of the national government should be bound by some solemn obligation to the due execution of the trusts reposed in them, and to support the Constitution, would seem to be a proposition too clear to render any reasoning necessary in support of it. It results from the plain right of society to require some guaranty from every officer, that he will be conscientious in the discharge of his duty. Oaths have a solemn obligation upon the minds of all reflecting men, and especially upon those who feel a deep sense of accountability to a Supreme Being. If, in the ordinary administration of justice in cases of private rights or personal claims, oaths are required of those who try, as well as of those who give testimony to guard against malice, falsehood, and evasion, surely like guards ought to be interposed in the administration of high public trusts, and especially in such as may concern the welfare and safety of the whole community."

"But it may not appear to all persons quite so clear, why the officers of the State governments should be equally bound to take a like oath or affirmation, and it has been even suggested that there is no more reason to require that, than to require that all of the United States' officers should take an oath or affirmation to support the State constitutions. A moment's reflection will show sufficient reasons for the requisition in the one case, and the omission of it in the other  The members and officers of the national government have no agency in carrying into effect the State constitutions. The members and officers of the State governments have an essential agency in giving effect to the national Constitution. The election of the President and the Senate will depend in all cases upon the legislatures of the several States; and in many cases the elec-

tion of the House of Representatives may be affected by their agency." This reasoning we deem satisfactory. Cooley's Constitutional Limitations, 74, 78, 82, 140, 150 ; Duer's Constitutional Jurisprudence, 403.

What the government of the State of Mississippi, a member of the Confederate States, did, from the passage of the ordinance of secession in 1861 to the surrender of the Confederate armies in 1865, cannot with any propriety be said to have been done by the government of the State of Mississippi, one of the United States. When that ordinance passed, there ceased to be within the State, a government under the Constitution of the United States. The governments of the several States of the Union are recognized by the government of the United States, and the government of the United States may refuse to recognize a particular State government, or may withdraw a recognition already given. Thus, in the time of the Dorr rebellion in Rhode Island there were two governments, each of which claimed to be the lawful government of the State, and the United States recognized one of them, and refused to recognize the other. And when South Carolina and several other States seceded, as it was called, the United States, though requested, refused to recognize the new out-union governments, as being no governments at all in those States. Yet, as those new governments superseded the old ones, there ceased to be any governments in those States recognized by the United States. It is nevertheless true, that, in point of fact, there were governments in those States.

Mr. Madison, in his report on the Virginia resolutions, says : " That the term States is sometimes used in a vague sense, and sometimes in different senses, according to the subject to which it is applied. Thus, it sometimes means the separate sections of territory occupied by the political societies within each; sometimes the political governments established by those societies ; and lastly, it means the people composing those political societies in their highest sovereign capacity."

The government of the United States has uniformly, from early in 1861 to the spring of 1865, characterized the control-

ling authorities of those seceded States not as governments, but as unlawful combinations of rebellious persons, usurping the functions of government, and forcibly controlling the people. That government has invariably regarded them as parts of a machinery for waging unlawful war, and making treasonable resistance to the rightful authority of the United States, having their central power in the government of the Confederate States, and co-operating in one combination for the unlawful and treasonable purpose of overthrowing by force of arms the Constitution of the United States.

It is insisted by counsel for the defendant in error, that the government of the State of Mississippi, during the late disastrous war, was at least a government *de facto*, whose obligations devolved upon the succeeding government. The terms *de facto*, as descriptive of a government, have no well-fixed and definite sense. It is, perhaps, most correctly used as signifying a government completely, though only temporarily, established in the place of the lawful or regular government, occupying its capital and exercising its power, and which is ultimately overthrown and the authority of the government *de jure* re-established. Guided by this rule, neither the government of the Confederate States nor the several governments of any of the States, composing the Confederacy can properly be said to be a *de facto* government, from the date of secession to the overthrow of the Confederate government. As to the Confederate government, it never held the national capital. It never asserted any authority to represent the nation. It was only what it professed to be — a revolutionary organization, seeking to establish a Confederacy of States, and dependent wholly for success upon the success of the revolution. But it never has been held that those participating in a rebellion, which had only extended its authority over part of a country, had established a *de facto* government. As to the government of this State, it was not overthrown by the former lawful government of the State, but by the arms of the United States; and when thus overthrown, it was not succeeded by the re-establishment of the authority of the former government *de jure*, for the

reason that that government was wholly destroyed by the establishment of the new government under the ordinance of secession.

But the terms *de facto*, when employed as descriptive of government, are often used, and perhaps more frequently in a sense less precise than that above indicated, as signifying any organized government, established for the time over a considerable territory, in exclusion of the regular government. A *de facto* government of this sort is not distinguishable in principle from other unlawful combinations. It is distinguishable in fact mainly by power, and in territorial control, and by the policy usually adopted in relation to it by the national government. With respect to such a government, it is clear that none of its acts in hostility to the regular government can be recognized as lawful, yet it is equally clear that transactions between individuals, which would be legal and binding under ordinary circumstances, cannot be pronounced illegal and of no obligation, because done in conformity with laws enacted or directions given by the usurping power. Between the extremes of lawful and unlawful there is a large variety of transactions, to which it is difficult to apply strictly any general rule.

It cannot be denied that the government of the Confederate States was in possession of many of the highest attributes of sovereignty — sufficiently so to be regarded for the time as the ruling or supreme power of the district of country over which its jurisdiction extended, and of sufficient resources in men and money to carry on a civil war of unexampled dimensions; and during all which time, in the interests of humanity, to mitigate the vindictive passions growing out of a civil conflict, and to enable the United States to invest the people of the Confederate States with the character of public enemies, and their property as enemies' property, in order that the advantages of capture and seizure might be rightfully secured according to the laws of war, many belligerent rights were conceded to it by the supreme government. Nevertheless, the Supreme Court of the United States, in the case of *Mauran* v. *Insurance Company*, 6 Wallace U. S. Rep. 13, have decided that all the proceedings

of the States in rebellion, either severally or in conjunction, by means of which the lawful governments in those States were overthrown, and new governments erected in their stead, were wholly illegal and void.

In the case of *Hill* v. *Boyland*, 40 Miss. 637, the court say : " Admitting, then, that the act of secession was a nullity, the State of Mississippi, neither in fact nor in legal contemplation, could be annihilated by a void ordinance. The attempt to change her relations towards the United States government only involved her external relations. Within her limits there remained a regularly organized government *de jure*, as well as *de facto*, which was never disputed." We freely admit that neither the people nor the territory of the State of Mississippi was annihilated by the void ordinance of secession, but we deny that 'the political organization established by the people of Mississippi, immediately following the passage of that ordinance, was a government *de jure* of the State; and we have before shown that it was not even a government *de facto*, according to the meaning of those terms as used in international law, when applied to the facts as they existed at the time that that organization was in operation in this State. The old government of the State was undoubtedly abolished by the new one, which had a constitution, as we have elsewhere shown, different in many important features from the old one. We think it would be transcending the bounds of judicial propriety to enter fully here into a discussion of the theory of State rights, which we think, is better suited to a political arena than a judicial forum. We will, therefore, content ourselves with the expression of a respectful dissent from the doctrines laid down by our learned predecessors in the case above referred to.

It is insisted that the laws of the State enacted during the war continue in force until altered or abrogated by the succeeding government.

The doctrine, that, by the law of nations, the municipal laws of a ceded or *conquered* country, existing at the time of cession or *conquest*, continue in force until altered or abrogated by the new sovereign, is not applicable to a case of rebellion. The

45.

territory of the State of Mississippi, was a district of country constituting a part of the territory of the United States. No nation can make a conquest of its own territory. It acquires no new title, but only regains the possession of which it was temporarily deprived. Upon the reduction of the rebellion, the territory of Mississippi was neither *ceded* to, nor *conquered* by, the United States, and therefore the principle invoked will not avail the defendant in error.

The State of Mississippi was absolved from the obligation of her contract to receive the treasury notes, commonly called the cotton notes, issued under the authority of the statute of the 19th December, A.D. 1861, in payment of the taxes and dues to her, by the destruction of the government which enacted it by the arms of the United States, in 1865.

A state is defined by Vattel, 59, to be a body politic, or a society of men, united together to promote their safety and advantage, by means of their union; who are guided and directed by the public political authority — the government. Government is the ligament that holds the political society together, and when that is destroyed, the society as a political body is dissolved.

Rutheforth, in his Institutes, lays down the doctrine, that "the rights which belong to a civil society fail or are lost when the society ceases to exist; and upon the same event the members of it lose their rights. But this is to be understood of those rights only which belonged to them as members of the society, and not of those which belonged to them as individuals. The right which each of them had to his life, to his liberty, to his lands, or to his movable goods, and other rights of same sort, are not directly affected by the destruction of the society of which they were members, however they may happen to be remotely affected. The same effect that is produced by the destruction of a society in the rights of the whole collective body and of its several members, will be produced, likewise, in their respective *obligations*. Thus the debts of a society are cancelled when the society perishes; though the members, whilst the society subsisted, were jointly bound to contribute

towards the payment of the public debts, this *obligation* will cease when the society subsists no longer. But the destruction of the society does not cancel any debts which the members of it had contracted as individuals, upon their own private account."

The laws of the insurrectionary government ceased when that government was overthrown. They had no legal authority, and had only the authority which force gave them, and when that yielded, the laws enacted by the unlawful government ceased to have any operative force as to the future. They could not, in the nature of things, continue to operate without the consent of the incoming legitimate authority. It rests with the succeeding legitimate government to revive and continue them in force.

The laws of the insurrectionary government of the State could not be enforced by the courts of the country unless they were adopted by the legitimate government, for the reason that the government that enacted them never was recognized by the government of the United States or any department thereof. Halleck on International Law and Laws of War, 75, § 22, says: "The recognition of the independence and sovereignty of a revolted province by other foreign states, when that independence is established in fact, is a question of policy and prudence only, which each state must determine for itself; but this determination must be made by the sovereign legislative or executive power of the state, and not by any subordinate authority, or by the private judgment of individual subjects. And until the new state is recognized by the government of the country of which it was before a part, or by the foreign state where its sovereignty is drawn in question, courts of justice and private individuals are bound to consider the ancient state of things as remaining unaltered." Wheaton enunciates the same doctrine in his Treatise on International Law, part 1, chapter 2, § 10. And in the case of *Luther* v. *Borden*, 7 How. U. S. Rep. 1, the court says: "Where there is a controversy between two governments as to which is the true government, the question must be settled by the political department, and not by the judiciary.

Samuel B. Thomas, Sheriff, *v.* Wm. B. Taylor.

The Constitution of the United States, as far as it has provided for an emergency of this kind, and authorized the general government to interfere in the domestic concerns of a State, has treated the subject as political in its nature, and placed the power in the hands of that department; that under the fourth section of the fourth article of the Constitution it rests with Congress to decide what government is the established one in a State. For, as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not; and when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority; and its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. The right to decide such questions is placed in Congress, and not in the courts."

No one, we believe, has ever doubted the proposition, that, according to the institutions of this country, sovereignty in every State resides in the people of the State, and that they may alter and change their form of government at their own pleasure. But whether they have changed it or not by abolishing the old government and establishing a new one in its place, is a question to be settled by the political power. And when that power has decided, the courts are bound to take notice of its decision, and to follow it. Any other rule of practice would break up the harmony of the government, and expose its political and judicial departments to continued conflicts. The one might recognize the new government, and the other refuse to do so; and thus involve the nation in conflicts of power between the different departments of the goverment. The new State government that enacted its laws has ceased to exist; it has no power any longer to enforce them, and surely it cannot with any legal propriety be contended that the courts of the United States, either State or Federal, are bound to execute the law of an extinct insurgent power enacted against the policy

and authority of the government of the United States, and with a view to its overthrow.

The rebellion, in its revolutionary progress, having *deprived the people of the State of Mississippi of all civil government*, the President of the United States, in order to avert the manifold evils consequent upon a state of anarchy, assumed to initiate the means for reorganizing a civil government for the people of the State, and with that view, on the 13th of June, A.D. 1865, appointed a Provisional Governor of the State, who, after appointing certain civil officers, and reviving and declaring certain laws to be in force, called a convention of the people of the State. That convention, in the month of August of that year, framed a constitution and organized the government now existing in the State, and passed an ordinance by which all the laws enacted by the legislature of the State, since the 9th of January, 1861, so far as the same were not in conflict with the Constitution and laws of the United States or of the constitution of this State as it existed on the 1st day of January, 1861, or *in aid of the rebellion*, except the laws in relation to crimes and misdemeanors, and except also an act to enable the railroad companies of this State to pay the moneys borrowed by them, approved December 7th, 1863, were revived, ratified, and declared to be valid and binding from their respective dates, and to remain in force until altered or repealed by the proper authority. And by the provisions of that ordinance all the official acts of the public officers of the State; all the official acts, proceedings, judgments, decrees, and orders of the courts of the State; and all marriages of persons capable of contracting that relation — are legalized, ratified, and confirmed.

Whether the President, in thus proceeding, transcended his legitimate powers, it is unnecessary to inquire, inasmuch as the Congress of the United States have recognized the existing government of the State as a provisional one. It is competent for the political department of the supreme government to waive any irregularity in the formation of a State government, and recognize it, as was done in the case of California; and such act

of recognition, though the proceeding might have been irregular, will bind the country and the courts.

The act in question of the 19th of December, 1861, authorized the issuance of treasury notes to the amount of five millions of dollars. This act, by virtue of which the treasury note was issued that was tendered to the plaintiff in error by the defendant in error in payment of the tax due the State on his cotton, we believe, in its operation and effects, to have been *in aid of the late rebellion*, and therefore was not revived and continued in force by the ordinance of the Convention of 1865. We regard it as a part of the financial system of the State at a time of great pecuniary want, to supply not only a circulating medium for the people in the transactions of their ordinary business, but also to furnish the means by which an empty treasury of the State might be replenished.

The tenth section of the act provides "that the said treasury notes shall be receivable .in payment of all taxes now due or that may hereafter become due to this State, or to any county or school fund, or municipal corporation, except the military tax;" and that "the said notes, when so received for taxes, may again be paid out by the treasurer upon any warrant of the auditor, drawn upon the general treasury." Hence, it will be seen that these notes were intended to supply an important part of the revenue by which the State government was to be sustained and enabled more effectually to aid the Confederate government in the prosecution of a sanguinary war, waged expressly for the purpose of subverting the government of the United States. These treasury notes, being thus issued against the public policy, and in violation of the Constitution of the United States, are, therefore, illegal and void.

This view of the case makes it unnecessary to consider whether these treasury notes are in violation of that provision of the Federal Constitution which prohibits the States from emitting bills of credit.

For the reasons stated in this opinion, the decree must be reversed, the demurrer sustained, the injunction dissolved, and the bill dismissed.

A petition for a re-argument was presented, and a re-argument refused.