## J. W. WELBORN v. R. MAYRANT.

1. RECONSTRUCTION—MILITARY COMMANDERS.—While, in matters purely political and for the preservation of the public order, very large discretion was given by the reconstruction laws to the military commanders in the lately insurrectionary states, absolute power over personal and property rights was not given. They could not, for example, set aside and vacate the judgment of a court in a civil suit. Per CURIAM, TARBELL, J., dissenting.

2. SAME.—Under the authority of the laws of congress, "to protect all persons in their right of person or property," and declaring that "all interference, under color of state authority, with the exercise of the military authority," should be "null and void," and requiring that the rebel state governments should, if continued, be "subject in all respects to the military commanders," the commanders had competent authority, in certain cases, to set aside the judgment of a circuit court and an award on which the same was based. Per TARBELL, J.

ERROR to the circuit court of Hinds county. BROWN, J.

The facts are stated in the dissenting opinion of TARBELL, J.

*Shelton & Shelton*, for plaintiff in error.

*Johnston & Johnston*, for defendant in error.

A majority of the court having reversed the judgment of the circuit court, the following dissenting opinion was delivered:

TARBELL, J.:

Mayrant was claimant of certain personal property, seized in an attachment suit by Welborn against one Thad. Miller. Welborn and Mayrant agreed to submit the ownership of the property to arbitration. The arbitrators decided adversely to the claim of Mayrant, and judgment was entered accordingly. Upon the application of Mayrant, the General, commanding the military department (General Gillem), on the 24th day of February, 1869, issued an order, of which the following is a copy, its formal parts excepted : " The commanding general of the fourth military district having become satisfied, upon evidence submitted to him, that in a suit involving the right of ownership of certain oxen and wagon, between J. W. Welborn and Randall Mayrant (colored), advantage was taken of said Mayrant's ignorance, by which advantage the case was submitted to a board of arbitration and said Mayrant defrauded of his property as above described, it is hereby ordered that the decision of said board of arbitration be annulled and the case returned to the jurisdiction of the proper civil court for settlement."

In obedience to this order, the cause was restored to the docket. Objections were taken, by motion and pleadings, to the authority of the military commander to make this order, but the action of the General was sustained; and upon the rulings of the circuit court in support of the order, the case comes up for review by writ of error. The question is not as to the justice or policy of the order, but it is whether the order was authorized. It might have been arbitrary, as all military orders are. The order assumes that proof was made to the military commander that the award was a fraud on Mayrant, and the presumption might be indulged that the order, like the judgment of a court, is conclusive of the fact, as a basis and justification of its issuance; but even this is unnecessary. Military rule

has both its benefits and its evils, like all other forms of government. People accustomed to the deliberate mode of business in courts, are justly restive under military control, with its prompt, absolute and necessarily arbitrary action. With this feature of the case I have nothing to do, and it can have no bearing upon the result. I join with all true patriots in the prayer that war, with its retinue of fearful results, may never return to us.

Having said thus much by way of showing what is not in the case, I will now present an analysis of the laws of congress under which the foregoing order was issued.

1. There was approved, March 3, 1865, an act entitled "An act to establish a bureau for the relief of freedmen and refugees." See U. S. Statutes at Large, vol. 13, p. 507. This law, in terms, confers upon the bureau, of which the commanding general is the head, subject only, according to this law, to the orders and instructions of the secretary of war, "control of all subjects relating to" freedmen:

2. An act to continue in force the foregoing law, approved July 16, 1866, and found in vol. 14, p. 173, U. S. Statutes at Large. Section 14 gives "military jurisdiction over all cases and questions concerning the free enjoyment" of the "immunities and rights" conferred upon the colored people. This "jurisdiction" is by these laws to be enforced under such rules and regulations as the president, through the secretary of war, shall prescribe."

In addition to "military jurisdiction," these acts of congress direct "military protection" to be extended in "all cases" embraced therein.

3. On July 6, 1868, another law of congress was approved, whereby the foregoing were continued, "with the same authority and jurisdiction" as thereby conferred. See U. S. Statutes at Large, vol. 15, p. 83.

4. In vol. 14, p. 428, U. S. Statutes at Large, may be found the "act to provide a more efficient government of the rebel states," approved March 2, 1867. The preamble to this law recites that "no legal state governments or adequate protection for life or property now exist in". those states. Section 1 enacts "that said rebel states shall be divided into military districts and made subject to the military authority of the U. S. Section 3 provides "that it shall be the duty of each officer, assigned as aforesaid, to protect all persons in their rights of persons and property, * * * and to this end he may allow local civil tribunals to take jurisdiction of and try offenses, * * * and all interference under color of state authority with the exercise of military authority under this act shall be null and void." And section 6 declares "that any civil government which may exist" in those states "shall be deemed provisional only, and in all respects subject to the paramount authority of the United States, at any time to abolish, modify, control or supersede, the same," etc.

5. An act supplementary to the foregoing, approved July 19, 1867, and published in U. S. Statutes at Large, vol. 15, p. 14, declares, in section 1, that "the true intent and meaning" of the act approved March 2, 1867, to have been, "that the governments then existing in the rebel states * * * were not legal state governments; and that thereafter said governments, if continued, were to be continued subject in all respects to the military commanders of the respective districts and the paramount authority of congress." Section 2 gives the district commander full power of removal from office, any person in his district, civil or military, and of appointment to all civil positions in the state. Section 11 requires these acts to be liberally construed, to the end that all the intents thereof shall be fully and perfectly carried out.

We have, then, first, in 1865 a law of congress which

confers upon the head of the bureau, who was the commanding general of the district, "control of all subjects" relating to the freedmen; and this law granted to the president almost unlimited discretion in its enforcement, by orders and instructions through the secretary of war. In 1866, another enactment, extending the first, and giving "military jurisdiction over all cases and questions concerning the free enjoyment," by the colored people, of the "immunities and rights" extended to them; and this "jurisdiction" was, by these acts, to be enforced under "such rules and regulations" as the president, through the secretary of war, might prescribe. In addition to this "military jurisdiction" over "all cases and questions" involving the "immunities and rights" of the freedmen, these statutes direct "military protection" to be extended in "all cases" embraced in the acts. In 1868, these laws were continued in force "with the same authority and jurisdiction" as in the acts thus extended.

Again, the reconstruction laws, begun in 1867, have express reference to persons and property. By these laws, "the rebel states"—that is, persons and property—are "made subject" to "military authority." It is enjoined upon the military commander "to protect all persons in their rights of persons and property." To this end, the commanding generals were authorized, in their discretion, to "allow local civil tribunals to take jurisdiction of and try offenses," not civil causes; and "all interference, under color of state authority, with the exercise of military authority under" these acts, is thereby declared "null and void." It was further enacted, that "any civil governments" existing in these states "shall be deemed provisional only, and in all respects subject to the paramount authority of the United States at any time to abolish, modify, control or supersede the same." The general commanding represented this "paramount authority" of the nation,

and there was, by virtue of this statute, conferred upon him power, by order, "to abolish, modify, control or supersede" these "provisional governments," in any and "all respects." This power of the general commanding, however, was questioned, to settle which, unequivocally and absolutely, beyond all doubt or controversy, another statute was passed, declaratory of the "true intent and meaning" of the former. Section 1 of this law enacts, that "the governments existing in the rebel states * * * were not legal state governments, and that thereafter said governments, if continued, were to be continued subject in all respects to the military commanders" and to the "paramount authority of congress." By this declaratory law, full power of removal from office, of any and all civil and military officers in these states, was given to these commanders, and of appointment to all civil positions as well. And, finally, these laws were required to be liberally construed, to the end that all the intents thereof should be fully and perfectly carried out.

With a lexicon in hand, I do not see how these statutes could have been more clearly and emphatically expressed. As doubts were raised upon the first, congress, in the second, declared these state governments, including the people and property, and all questions concerning both, to be "subject in all respects to the military commanders." For the time being, a strictly military government was placed over these states. The military commander was the source of power, authority and law, enforced, if necessary, at the point of the bayonet. He could annul the constitution or code in whole or in part, or he could make law by his military *fiat*, as he did. The newly made citizens were thus placed in the jury box, and taxes were thus regulated. See Gen'l Order, No. 28, issued April 14, 1869.

A statute of the state was annulled. The poll-tax was reduced and regulated, and the modes of collection

VOL. XLVIII.—42

and of returns were defined. Gen'l Orders, No. 32 and 33, 1869. By circular, in 1867, the military commander directed wages due to laborers to be secured by assignments of cotton in cases where landlords distrained or attached cotton or other property for rent. After securing the laborer, the order then permitted the execution of the process as to the balance of the cotton. Circular No. 2, in 1868, regulated the carrying of concealed weapons and provided for the trial of offenders. In a similar mode, cultivated lands were exempted from sale by execution. In other words, the execution of judgments was suspended by military interference as to cultivated lands. This military authority reached to every corner and hamlet in the state. As a matter of fact, the bureau and the military exercised civil authority in every county, in which there were dozens, and in some counties hundreds of cases, where they summoned parties before them, and heard and determined causes involving rights of persons and property. This was the recognized regular business of the military, and such work constituted the chief labors of the officers and soldiers of the army. Of these cases reports were regularly made to the military commander, and by him to the authorities at Washington. Records were also made of these cases, in bound volumes, by every officer hearing them, as I understand, and a full history of every such cause can now be found thus preserved. The number of causes so heard and determined by military authority, equals, if it does not exceed the number tried in the civil courts of the state in like period of time. Of the action of the military, the country and the heads of departments at Washington were well aware, as it continued in this state from 1865 to 1869–'70. In the exercise of the power invested in the military commander, he could hear and determine these causes, as he often did, in person; he could, as was common,

detail one of his staff for that purpose; he could appoint, in his discretion, any person to perform this service or to hold the civil courts of the state, and for the time being his will was law, subordinate to his superiors, to the law under which he acted, to the army regulations, and to a "higher law" by which military law is governed, prompt, peremptory and absolute, however, in its operation. In the case at bar, undoubtedly General Gillem could have entered the court, pending the trial, displaced the judge and disposed of the cause himself.

An American citizen, accustomed to the impartiality, tenderness and delays of civil courts, has an educated dislike of military government, but the question involved is not one of sympathies, prejudices or preferences. It comes to this: Was there, in fact, in Mississippi, from 1865 to 1870, a pure, undisguised, absolute military government? And under the laws organizing such a government, had the general commanding, authority to issue, with binding force, the order of which a copy was heretofore given? From my standpoint, so plain and unequivocal is the language of the stautes quoted, that I am not at liberty to answer these questions otherwise than in the affirmative. If policy could be allowed to weigh in the scales, it would, in my opinion, at this length of time, and in view of the peace and quiet now prevailing, afford an argument against disturbing military judgments. The people, though restive and occasionally subjected to hardships, perhaps, at the hands of the military, are settling down to their usual avocations, and generally accepting the situation, and forgetting their losses. The judgment in this case is a virtual condemnation, as I understand it, of every military interference in civil causes, of which, from 1865 to 1870, were tens of thousands.

And finally, as a precedent, I can only view the

denial of military power in this case as fraught with danger, and shall so continue to view it until time shall have barred all further rights of action arising out of military interference.

It may be well to observe, that the constitutional question not being presented in this case is not embraced in its consideration. And, I may add further, that in arriving at the authority conferred by the foregoing statutes, no argument, illustration, or rule of construction, can give additional force to their own plain, unequivocal language. If they do not, and were not intended to, confer the power assumed in this cause, then congress committed the absurdity of maturing lengthy statutes abounding in words and phrases signifying absolute power over all questions and for all purposes; laws by which constitutions, codes and courts were suspended, overturned, modified or annulled, at will; and by which persons and property and governments in the rebel states, were in all respects made subordinate to the military commander, when, in fact, congress meant no such thing. But thousands of cases in every one of the states in rebellion attest military jurisdiction in civil cases, with the knowledge of the nation and of congress, the approval of the departments at the federal capital, and the sanction and authority of the president, as expressed in orders and instructions, in pursuance of those laws. If, on the other hand, the military was sent south only as a police force, to act as a *posse commitatus* to civil officers, and merely to preserve the peace, such a purpose could have been declared in a line or two, in unmistakable language, whereas the absolute power of the military, in both civil and criminal cases, is reiterated and repeated in every form of expression, evidently with a design to give no chance for doubt.

If the courts were to be left unmolested and superior to the military, congress was not so deficient in

a knowledge of language as not to be able in half a dozen words to give expression to such an intention. But the very reverse of this purpose was the fact; the intention and the practice and the real intent of the national will was set forth in statutes so plain that the record of a more important character may be adopted: "Write the vision, and make it plain upon tables, that he may run that readeth it."

The case at bar is of itself of comparatively little importance, but, as a precedent, I look upon it as a "cloud," at present not "bigger than a man's hand," yet one which, in the future, may overspread, under circumstances, the horizon of our state.

If the judgment now pronounced in the case at bar be correct, then, from the views I entertain, the case of Thomas v. Taylor, 42 Miss. 651, should be obliterated.

Having had the matter of this military order before me while presiding in the circuit court, it is proper for me to add, that it is not only my right, but my duty, to take an active part in the consideration of this case, as in all others.   1 Comst. 1.

I am of the opinion that the judgment of the court below, sustaining the order of the military commander, should be affirmed.